Shields *v.* Clifton Hill Land Co.

\* Shields *v.* Clifton Hill Land Co.

| 94 | 123 |
|-----|-----|
| 110 | 665 |

(*Knoxville.* November 20, 1894.)

1. CORPORATIONS. *Pleadings and proof insufficient to raise syndicate liability.*

Allegations that a corporate charter was invalid because defectively acknowledged, and that the promoters are therefore personally liable, are not sufficient to charge them with personal liability on any other ground, such as that of a partnership liability antecedent to the attempted incorporation. The Court likewise decides, upon elaborate consideration, that the evidence fails to show any antecedent partnership liability of the promoters. (*Post, pp. 125–144.*)

Cases cited and distinguished: Broyles *v.* McCoy, 5 Sneed, 603; Brandon *v.* Mason, 1 Lea, 615.

2. SAME. *Purchase of lands by corporation, not by syndicate, when.*

A purchase of lands in the name of a corporation the charter of which, prepared for that purpose by the vendor's attorney, had been signed and filed, but defectively acknowledged, and for which money notes were given, signed by a person described as its president, although no organization by election of officers had then been made, does not make him or other promoters personally liable on the purchase, especially when the corporation, at its first formal meeting, approved the purchase, and the vendors have recognized it as the purchaser on a foreclosure. (*Post, pp. 137–144.*)

3. SAME. *Charter acknowledged before Notary void.*

A charter acknowledged before a Notary Public was void under the general incorporation statute of 1875. (*Post, pp. 146, 147.*)

Act construed: Acts 1875, Ch. 142.

Cases cited and approved: Brewer *v.* State, 7 Lea, 682 ; Teasley *v.* State (oral).

\* Reported and annotated in 26 L. R. A., p..509.

Shields *v.* Clifton Hill Land Co.

4. SAME. *Statute curing void charter constitutional.*

A statute curing a defective acknowledgment that rendered a corporate charter void, and thereby defeating an existing liability of the corporators under the contract of the company, does not impair any contract obligation of the other parties to the contract. (*Post, pp. 146–153.*)

Constitution construed: Art. I., § 20.

Act construed: Acts 1890, Ch. 17 (Ex. Ses.).

Cases cited and approved: Townsend *v.* Townsend, Peck, 15; Wynne *v.* Wynne, 2 Swan, 405; Collins *v.* Railroad, 9 Heis., 847; Marr *v.* Bank, 4 Lea, 585; Knoxville *v.* Bird, 12 Lea, 121; Demoville *v.* Davidson County, 87 Tenn., 223; 94 U. S., 113; 97 U. S., 25; 101 U. S., 814; 108 U. S., 150–1, 488; 2 Peters, 412.

5. SAME. *Same.*

A law which facilitates the intention of the parties to a contract by removing its invalidity does not impair any vested right. (*Post, p. 152.*)

Case cited: 2 Peters, 412.

6. SAME. *Estoppel to deny validity of charter.*

Persons who have sold land to a defectively organized corporation, and taken back purchase money notes, will be estopped from denying the corporate liability and seeking a recovery from the corporators of the amount due, if for more than five years, and until after the company's charter and contracts have been expressly validated by the Legislature, they have recognized the notes as corporate obligations, and attempted to enforce them by legal process against the corporation. (*Post, pp. 153, 154.*)

Case cited and distinguished: Broyles *v.* McCoy, 5 Sneed, 603.

7. SAME. *All creditors can enforce payment of stock subscriptions.*

A creditor whose debt was created before the capitalization of the company or any subscriptions to its stock, as well as subsequent creditors, can, under the Tennessee statute, enforce the liability of the stockholders for unpaid subscriptions. (*Post, pp. 154–159.*)

Code construed: § 1708 (M. & V.).

Act construed: Acts 1875, Ch. 142.

Case cited and approved: 120 Ill., 350.

8. SAME.   *Contract to receive property in payment of stock subscriptions.*

An authorized contract, whereby a corporation receives needed property in payment of stock subscriptions, is presumed valid until it is impeached by appropriate pleadings and proof. (*Post, pp. 159–162.*)

Cases cited and approved: Kelley Bros. v. Fletcher, *ante*, p. 1; 5 Dillon, 50; 31 N. E. Rep., 362; 119 U. S., 345.

.FROM HAMILTON.

Appeal from Chancery Court of Hamilton County. T. M. McCONNELL, Ch.

J. T. & J. K. SHIELDS, WHITE & MARTIN, and PICKLE & TURNER for Complainants.

ANDREWS & BARTON; WATKINS & BOGLE; COOK, FRAZIER & SWANEY; BARR & McADOO, and NEIL W. CARUTHERS for Defendants.

CALDWELL, J.   This is a suit by vendors of real estate to collect balance of purchase money remaining unpaid after enforcement of vendors' lien, by resale of the land and application of proceeds.

On February 3, 1887, Mrs. Anna N. Watkins, a widow lady, and her daughter, Miss Alice M. Watkins, in consideration of one thousand dollars ($1,000) to them paid, executed to Chas. A. Lyerly, president of the East End Land Company, an option on their farm of 190 acres of land, near Chattanooga,

Tennessee. By the terms of the option, the ladies bound themselves to execute to said Lyerly, "or his indorsee" of the option, a warranty deed to said land, if said Lyerly "or his indorsee" should, within twenty-five days thereafter, pay to them, thirty-five thousand dollars ($35,000) in cash, and, further, execute to them five several promissory notes for eighteen thousand dollars ($18,000) each, due respectively at one, two, three, four, and five years, "with interest from date at six per cent., payable semiannually, and secured by a vendors' lien on the land."

On February 28 (the day the option expired), the directors of the East End Land Company, in regular meeting, decided that their company would not purchase the land, and, upon motion regularly made and carried, directed that the option "be transferred to another company, or purchasers," preferring the stockholders of the East End Land Company.

On the same day, Chas. A. Lyerly paid to J. A. Caldwell, agent and attorney for the vendors, eight thousand five hundred dollars ($8,500), as a part of the cash payment for the land. A few days later, on March 7, 1887, he made a still larger payment to the same person, and ten days thereafter, he paid the balance, taking a receipt in the words and figures following:

"$10,350.00. Received of Chas. A. Lyerly, ten thousand three hundred and fifty dollars ($10,350), balance cash payment on his purchase of our Oakland farm in Ninth and Seventeenth Districts, upon the

terms and conditions mentioned in our contract, dated fifth (5) February, 1887. Deed to be made as therein stipulated, upon the request of said Lyerly or his assignee. This the seventeenth of March, 1887.

(Signed)          "MRS. A. N. WATKINS,

"ALICE M. WATKINS,

"By J. A. CALDWELL, *Agent.*"

On the day this last payment was made, the persons who had decided to organize "another company" to purchase the land, and who had · furnished Lyerly the money with which to make the cash payment of thirty-five thousand dollars ($35,000), procured the same Mr. Caldwell to draft a charter for such other company, the latter to be known as the Clifton Hill Land Company. The charter was drawn as desired, and signed by six incorporators on that day. It was acknowledged on March 22, 1887, recorded March 24, 1887, filed for registration with the Secretary of State March 28, 1887, and thereafter finally registered in the Register's office of Hamilton County, where the corporation was to have its chief business office, on March 30, 1887.

Chas. A. Lyerly, the owner of the option, assigned or transferred it to the Clifton Hill Land Company, and on the fourteenth day of April, 1887, the vendors, in pursuance of the terms of the option, executed a deed, whereby they conveyed the land to the said company, as his "indorsee" or "assignee." The notes were made to run from the first day of March, 1887, though dated April 14, 1887. Ex-

cept as to date of maturity, the notes were the same. The one maturing first is in the following words:

"CHATTANOOGA, TENN., April 14, 1887.

"On first March, 1888, next after date, we promise to pay to Mrs. Anna N. Watkins and Miss Alice M. Watkins, or order, eighteen thousand dollars, value received, with interest at 6 per cent. per annum from March 1, 1887, payable semi-annually.

"This note is given for part consideration for and its payment . is secured by a vendors' lien on the following real estate * * described in deed of this date. If necessary to resort to law, to enforce the payment of this note or protect the security for its payment, we agree to pay all costs of necessary litigation, together with a reasonable attorney's fee.

"$18,000.00.            (Signed)   E. WATKINS,
            "*President Clifton Hill Land Company.*"

Mr. E. Watkins, whose name appears upon the notes, was one of the incorporators, and it was understood between him and his associates . that . he should be the president of the company, though no organization was in fact effected, by the election of officers, until the ninth of June, 1887, at which time he was elected president.

E. Scott was elected secretary and treasurer of the Clifton Hill Land Company at the same time; and thereafter, in September and November, he, as such officer, paid to the vendors twenty-seven hundred dollars ($2,700), the first semi-annual inter-

est on said five purchase money notes.    These pay-
ments were made to J. A. Caldwell, and receipted
for by him as agent and attorney.

On April 9, 1889, the principal of two of the
purchase money notes being then due and unpaid, the
vendors filed their bill against the Clifton Hill Land
Company and E. Watkins, to enforce their vendors'
lien; E. Watkins being made a party for the rea-
son simply that his name appeared upon the notes.
He demurred to the bill, because it contained no
allegation whereon he could be charged with per-
sonal liability.   His demurrer was sustained, and the
bill was dismissed as to him.

Thereafter, on the nineteenth of March, 1890, the
vendors and W. S. Shields, who had intermarried
with Miss Alice M. Watkins, filed a supplemental
bill, whereby they sought to hold the incorporators
of the Clifton Hill Land Company personally liable
for the balance of purchase money that might re-
main unpaid after exhaustion of the land, upon the
alleged ground that the charter obtained by them
was invalid, and that their attempted incorporation
thereunder was, as a consequence, ineffectual.

Pending these bills, the Clifton Hill Land Com-
pany filed a bill against the vendors and others,
seeking to rescind the sale of the land to that
company, on account of alleged fraud and deceit
practiced in the sale of the land.   This bill was
answered, and all charges of fraud and deceit were
denied.   Of this last bill it need only be further

9—10 P

said, at this place, that it was dismissed upon final
hearing; and from the decree of dismissal there
has been no appeal or writ of error.

In the progress of the litigation, the vendors
voluntarily dismissed their supplemental bill, so far
as it sought "any personal relief or recovery
against the individual defendants, but no further or
otherwise." And upon the hearing of the case as
it then stood, decree was rendered against the Clif-
ton Hill, Land Company for the balance of unpaid
purchase money, attorney's fees, etc., and the Mas-
ter was directed to sell the land in satisfaction
thereof, unless the amount due should be paid into
Court within a time named. The money was not
paid, and the land was sold, and purchased by the
original vendors, at the price of forty-seven thou-
sand dollars ($47,000). The sale was confirmed, and
title divested and vested.

From these decrees the Clifton Hill Land Com-
pany appealed to this Court.

The case was considered, and the decree below
affirmed, upon grounds appearing in . the opinion of
this Court reported in 91 Tennessee, at pages 683
to 692, inclusive.

On March 1, 1892, while the appeal in that
cause was still pending, W. S. Shields and his wife, ·.
formerly Miss Alice M. Watkins, and her mother,
Mrs. Watkins, commenced the present proceeding by
what the pleader termed "an original bill in the
nature of a supplemental bill," to establish per-

sonal liability upon E. Watkins and various other defendants, and to collect from them individually the balance alleged still to be due on the decree rendered against the Clifton Hill Land Company under the vendor's bill.

In an amended and supplemental bill, filed by the same parties on February 3, 1893, they allege that the said balance, as ascertained by decree of this Court in the other case, is $77,916.50; and that an execution has been issued for the same and returned *nulla bona*. The grounds upon which individual liability is claimed on the one hand in these bills, and denied on the other hand in the answers thereto, will properly appear hereafter. At this point it is sufficient to say that each and every defendant, except the Clifton Hill Land Company, strongly denied his liability upon any ground, and that the Chancellor, with the pleadings, proof, and decrees in all the cases herein mentioned before him, deemed the defenses good, and therefore dismissed these bills. Complainants have appealed and assigned errors.

The first assignment of error is as follows: "The Court erred in refusing to hold the said individual defendants who composed the syndicate, or partnership, liable for the balance due complainants on the purchase price of said lands. The notes given therefor were those of the partnership, and not the notes of the corporation. They antedate the corporation."

This assignment, and the argument in support of

it, are based upon the contention that the incorporators of the Clifton Hill Land Company, and their associates, were, in the first instance, partners under that name, and that as such they purchased the land and gave notes for the purchase money before incorporation, and in doing so became individually liable for the purchase price. If this contention be true as to the facts of the case, it is also true as to the legal result, nothing else appearing.

"It is well settled," says Judge Wright, "that where an association, which has existed as a mere copartnership, becomes incorporated, and the corporation then accepts an assignment of all the property of such association, for the purpose of carrying out their object, they are primarily and jointly and severally liable for all the debts incurred before the act of incorporation. In such a case the responsibility of the corporation for contracts previously made with the association does not become substituted so as to exempt the members from individual liability, and it does not change the case that the members of the company had it in view to procure a future act of incorporation when it was formed." *Broyles* v. *McCoy*, 5 Sneed, 603.

But these complainants can have no relief upon that view of the case, because neither alleged in the pleadings nor established by the proof.

It is true that "when the language of a bill is susceptible of a limited or enlarged construction as to its object and extent of relief sought, but the sub-

sequent proceedings show that the complainant, the Court, and the defendant, construed the words in the enlarged sense, that meaning will be considered as the one intended." *Brandon* v. *Mason*, 1 Lea, 615.

That rule, however, will not save the present case on the point made in the first assignment of error. The bills proceed upon two, and only two, distinct and alternate grounds of personal liability: (1) because the attempt to incorporate was ineffectual, and (2) because, if effectual, subscriptions to stock have not been fully paid. The proposition of liability upon any other ground is not advanced in either of the bills. Those parts of the very lengthy original bill most directly in point are the following: "Complainants are informed, and upon such information charge, that the defendant, Clifton Hill Land Company, was intended to be chartered and organized as a corporation under the Act of 1875 and amendatory Acts of the Tennessee Legislature. A charter was attempted to be obtained on March 30, 1887, and is in substantial compliance with said Act, except that the signatures of the persons applying for the charter to the same, were acknowledged before W. G. McAdoo, Jr., a Notary Public, instead of the County Court Clerk, as then required by law.

"Whether said defendant is a corporate body, under which its promoters can escape personal liability, or a partnership, these complainants submit to the wisdom and decision of the learned Court, and, in view of the uncertainty attending a solution of this ques-

tion, ask to be allowed to file its bill in a double aspect, as more fully set forth hereafter.

"The charter members of said defendant company are defendants E. Watkins, E. Scott, I. Noa, Jas. S. Pinkard, S. W. Divine, and Jno. A. Hart, now deceased.

"Acting upon the supposition that they had a valid charter, the promoters and projectors of the Clifton Hill Land Company fixed its capital stock at $250,000, divided into 2,500 shares of the par value of $100 each, and opened books for stock subscription. The stock was all subscribed, officers elected, and all steps taken necessary to fully organize and equip a corporate body for business. The officers elected were as follows: Defendant E. Watkins, president; I. Noa, vice president, and E. Scott, secretary and treasurer. The $250,000 of stock was subscribed for by the following persons, as shown by the minute book kept by the secretary and treasurer, Scott:

| NAME. | NO. SHARES. | AMOUNT. |
| --- | --- | --- |
| Jno. A. Hart | 250 | $25,000 |
| W. P. Richardson | 500 | 50,000 |
| E. Watkins | 250 | 25,000 |
| T. C. Catchings | 250 | 25,000 |
| I. Noa | 250 | 25,000 |
| E. Scott | 250 | 25,000 |
| H. A. Bussick | 250 | 25,000 |
| Little & Brown | 250 | 25,000 |
| Jas. S. Pinkard | 250 | 25,000 |
| Making in all | | $250,000 |

Again: "Complainants are advised and insist that

the defendant, Clifton Hill Land Company, at the time it became indebted to complainants, was not a valid and legal corporation, by reason of having its charter defectively acknowledged, the acknowledgment having been taken before a Notary Public, instead of the County Court Clerk, as the law at that time required ; and that said Clifton Hill Company was a voluntary association, and that all those who were interested in the same and agreed to take stock therein are liable to complainants individually and personally, each for the entire amount of the notes heretofore sued upon, as hereinbefore stated.

"Complainants are further advised and insist that complainants' rights having been acquired and vested when said notes were executed, in the year 1887, that the subsequent Act of the Legislature, attempting to legalize corporations whose charters were acknowledged before Notaries Public, could not affect rights then vested, and, regardless of the effect of said Act upon the rights acquired subsequent to its passage, said Act could in no way affect or disturb complainants' vested rights to hold said projectors of said corporation as partners personally liable upon such notes ; and complainants ask that said defendant stock subscribers hereinbefore named be held personally liable for the balance due upon the decree hereinbefore left unpaid after crediting the net amount received from the sale of the 190 acres of land. But if complainants are mistaken in this position, and said defendant company is a valid cor-

poration, and must be treated as such in these proceedings, then complainants insist that said defendant stockholders hereinbefore mentioned are liable to them upon their various and sundry stock subscriptions. * * * Said company, as its name indicates, was a land company, organized for the purpose of speculating in real estate, having for its object the buying of large bodies of land and subdividing the same, and selling it off into lots and blocks at an advanced price."

These allegations, briefly stated, are that the charter of the Clifton Hill Land Company was invalid because defectively acknowledged, and that the defendants are therefore personally liable for the company's debts; and, in the alternative, that if it should be adjudged valid, then defendants are personally liable for unpaid stock. Whether they were liable upon the one ground or the other, complainants, filing their bill "in a double aspect," are pleased to "submit to the wisdom and decision of the learned Court." That the complainants themselves so understood their original bill is further shown by the face of the amended and supplemental bill. In the latter bill, among other things, they say: "Said original bill further charged that the defendant company had attempted to procure a charter of incorporation under the laws of Tennessee, pursuant to the provisions of the Act of 1875 and amendatory Acts, but that the acknowledgment of the charter was had before a Notary Public, and

not the Clerk of the County Court, as the law required; and the question of the legality of said charter was submitted to the Court, the bill being brought in two aspects: (1) To hold the projectors of the said Clifton Hill Land Company personally liable in the event it was ascertained that the attempted corporation was illegal; and (2) to hold them liable as stockholders for non-paid-up stock in the event the Clifton Hill Land Company was ascertained to be a body corporate."

The theory of partnership or syndicate liability, otherwise than as the legal result of a futile effort at incorporation, is not put forth in either of the bills. The answers did not enlarge the scope of the bills themselves. Their denials of personal liability, though in the broadest language, are to be applied only to the grounds upon which such liability was charged in the bills.

If it were conceded, however, that the bills state facts sufficient to charge defendants with personal liability as partners in the purchase of the land, prior to a grant of the charter, and without reference to its validity or invalidity, the result would still be the same, upon this branch of the case; for the reason that the proof introduced fails to show that the land was so purchased.

Undoubtedly, some of the defendants, who were stockholders in the East End Land Company, contemplated the purchase of this land, in some form, from the time that company declined to buy it. The

idea among them was to find ten men who were willing to become equally interested in the matter. Nine were found, and one of them agreed to take a double part. They accordingly furnished to Chas. A. Lyerly, in three installments, $35,000, with which he made the cash payment. At first there was no distinct agreement or understanding, even among those parties themselves, and, much less, with Mrs. Watkins and her daughter, as to the form in which the purchase should be made, or who should become the owner of the land, receive the deed, and make purchase money notes. It was soon determined, however, that a corporation, to be organized and known as the Clifton Hill Land Company, should be the purchaser; and on the day the last instalment of the $35,000 was paid to the agent and attorney of the vendors, he was apprised of that fact, and employed to prepare the charter, which he did without delay. The charter was signed, acknowledged, filed with the Secretary of State, and then finally registered, with his certificate attached. Assuming all of those steps to have been regular, as they were unquestionably intended and supposed by all parties to be, the formation of the company as a body politic was then complete; and its validity as such could not thereafter be collaterally questioned. Code (M. & V.), 1693.

Soon thereafter the Clifton Hill Land Company, as the assignee of Lyerly, completed the purchase of the land, by taking a deed thereto, and executing notes for the unpaid purchase money. The vend-

ors never thought of the nine promoters, if they be termed such, as their vendees. They were not concerned as to who the purchaser should be. All they wanted was to have the terms of the option complied with, for their own security; and whether that should be done by Lyerly or by another as his assignee of the option, was a matter of indifference to them. They, in fact, supposed, as they repeatedly say in their depositions, that the East End Land Company was their vendee. This supposition on their part was no doubt due to the fact that Lyerly, the holder of the option, was president of that company. Certain it is that they did not think they were selling to a mere partnership or syndicate, and that they did not rely upon the personal liability of these defendants as original purchasers. Mr. Caldwell, their agent and attorney, who represented them intelligently, faithfully, and honestly, from first to last, in this whole matter, and who was conversant with all the important stages of the transaction, had no thought that these defendants were purchasing the land and assuming to pay for it, either as a copartnership or as individuals. He knew that the Clifton Hill Land Company, but recently incorporated, was in fact the real purchaser and vendee. He wrote the charter with that fact in view, and subsequently drafted the deed and purchase money notes. The name "Clifton Hill Land Company" was used for the first time in the charter; and there was no prior copartnership or syn-

dicate by that name. The vendors, by the terms of the option, as has already been seen, bound themselves to convey the land to Lyerly "or his indorsee," whoever or whatever that might be. Prior to the final registration of the charter of the Clifton Hill Land Company, all business with respect to the option and the land was transacted with Lyerly, as the owner of the option and purchaser of the land. He made the cash payment and took receipts for the different installments thereof, in his own name. In the last of these receipts the vendors referred to the sale as "his purchase" and again stated that they would make a deed to him "or his assignee."

After the grant of its charter, the vendors dealt with the Clifton Hill Land Company as Lyerly's assignee. They conveyed the land to it, and received its notes for unpaid purchase money. Only Lyerly, the person to whom the option had been granted, and the Clifton Hill Land Company (his assignee) were known in any of the writings with respect to the land or the purchase price thereof. Before the time came to make the deed, Lyerly was on one side of the contract and the vendors on the other. After that time, the Clifton Hill Land Company, Lyerly's assignee, was on one side of the contract and the vendors on the other. In view of the terms of the option, only Lyerly "or his indorsee" could properly have been thought of as vendee. Only he "or his indorsee" could lawfully

have demanded and received a deed to the land. There was no room for any intermediate purchaser. Lyerly assigned the option to the Clifton Hill Land Company as a corporation, not as a syndicate or copartnership, and the vendors conveyed their land to it and took its notes for unpaid purchase money in the same way. Though the assignment by Lyerly and the signature to the purchase money notes fail to characterize the Clifton Hill Land Company as a corporation in so many words, and though the deed to the land has been lost, so that its exact language cannot be known, it is conclusively shown by other proof that the name was used in those instruments as that of a corporation, and not otherwise. There was no voluntary company or copartnership or association by that name. Besides the other proof on the subject, the signature, "E. Watkins, President Clifton Hill Land Company," of itself indicates a corporate contract, and suggests corporate rather than personal liability. *Case Mfg. Co.* v. *Soxman*, 138 U. S., 437.

Mr. Cook, citing that case, says: "The corporation alone is liable where its note was given in fulfillment of a contract entered into in its name, although such contract was prior to its incorporation." Cook on S. & S., Sec. 707, p. 1046.

At the first formal meeting of the stockholders of the Clifton Hill Land Company, on June 9, 1887, after the election of officers and capitalization on the same day, the following action was taken: "On

motion of John A. Hart, it was resolved that this company buy from the original purchasers of the Watkins farm all their interest therein, and pay them, in paid-up stock of this company, the sum of $250,000, and assume their liability of $90,000 due to Mrs. Watkins, the original vendor.''

This minute entry is said to afford ''unequivocal evidence'' that the notes given to the vendors of the land were the notes of a ''syndicate.'' Such would seem to be true if that, were all the evidence on the point, but, in the light of the other evidence in this record, it cannot be so. The object of the motion, judged by the other writings and proof, to which reference has already been made, must have been simply to formally approve the purchase already made for the corporation, and to provide for the issuance of stock to those who had furnished money with which to make the cash payment. The language used is not the most appropriate for the accomplishment of such an end; still, that must have been the purpose.

Treating the organization as not entirely complete when the deed was made to the Clifton Hill Land Company, and the notes executed by it, approval or disapproval, and compensation to those who had advanced the $35,000, were the only questions with respect to the purchase of the land that could have been open for the consideration of the stockholders when that motion was made and carried. At the most, the stockholders then had power only to say

that they would, or that they would not, ratify what had previously been done for the corporation, and in its name. Whatever they may have intended, they could not have changed the fact, otherwise abundantly established, that the land was in reality purchased in the corporate name.

Moreover, after the ninth of June, as before, all parties treated the notes previously executed as the obligations of the corporation. The vendors continued to hold the notes, received interest on them from time to time from the corporation, through Scott, its secretary and treasurer, and, after maturity and default, filed their bill against the corporation as purchaser of the land and maker of the notes; sold and repurchased the land, and, after application of proceeds, obtained decree for balance against the corporation alone.

Though not expressly so called in the bill and decrees in that cause, it is entirely manifest that the Clifton Hill Land Company was proceeded against as a corporation, and not otherwise. Indeed, the decree for balance now sought to be collected could be valid upon no other idea; for, a merely voluntary syndicate, company, or partnership by that name, had there been such, could have been bound only by naming the individual members' thereof in the bill and decree.

As a concluding observation, with respect to the first assignment of error, it is well to say that complainants not only fail, both in their pleadings

and in their testimony, to assert that they sold their land to the defendants as partners, but they plainly negative such an idea in many ways, and distinctly state in the tenth section of their present original bill that they conveyed it to the Clifton Hill Land Company as a corporation. That statement is in these words: "The said defendant, Clifton Hill Land Company, as a corporation, is absolutely, utterly, and notoriously insolvent. It never had any assets, real or personal, except the 190 acres of land conveyed to it by complainants, Mrs. Watkins and Mrs. Shields, and that, as already shown, was never paid for by it; and, as has already hereinbefore been shown, the same has been sold at public outcry for $47,000, and bid off by complainants, Mrs. Watkins and Mrs. Shields, and, since the sale of said property, defendant company has not a cent of property of any kind left." And, in section twelve, they refer to the notes for the land as "the notes held by complainants, Mrs. Watkins and Mrs. Shields, against said defendant company."

The second assignment of error is as follows: "Treating the notes given for the purchase price of said land as those of the corporation, by adoption, the said individual defendants are, nevertheless, personally liable thereon, and the Court erred in refusing so to hold: (1) Because the corporation did not, by any perfected act, assume this liability of its promoters, or substitute itself in this respect for its promoters. (2) But if it had done so, there is no

proof of the acceptance by complainants of this substituted liability. At most, complainants only accepted the additional liability of the corporation. (3) And, in any event, the Clifton Hill Land Company never had power to do any lawful act, its charter being void for want of proper acknowledgment.''

The controlling thought underlying the first and second subdivisions of this assignment is readily seen to be that of primary liability on the part of the individual defendants, as the result of their having been the original purchasers of the land, in the capacity of promoters and partners. The question there raised is substantially the same as that presented in the first assignment of error, which has just been so elaborately considered as to render further discussion of the question unnecessary. It is sufficient to say, briefly, that the pleadings do not assert, and the proof does not sustain, such a proposition. The contract of purchase was that of the corporation as such, and its liability for the purchase price was primary and exclusive, provided, only, that all preliminary steps necessary to incorporation were validly taken.

This brings us to a consideration of the third subdivision, which presents the primary ground of relief sought in the bills, viz., that the charter of the Clifton Hill Land Company was invalid, because not acknowledged before the proper officer, and that, as a legal consequence, the supposed incorporators became liable, as individuals, for the contract made in the corporate name.

10—10 P

There can be no doubt that persons assuming to act under a charter invalid because some positive requirement of the law has not been complied with, are liable as individuals for all debts contracted by them in the name of such corporation. Such persons so contracting in such a case, stand in the room and stead of the corporation, and must answer personally for its obligations to third persons. 2 Spelling on Priv. Corp., Secs. 832, 838; 1 Beach on Priv. Corp., Sec. 16.

The statute in force at the time the charter of the Clifton Hill Land Company was obtained imperatively required the acknowledgment of the proposed incorporators to be taken before the Clerk of the County Court of the county where the main business of the corporation was to be conducted, and permitted it to be taken by no other official. Acts 1875, Ch. 142, Sec. 3; Code (M. & V.), § 1989. The acknowledgment was, in fact, made before a Notary Public, and, for that reason, the charter was invalid. *Teasely* v. *The State* (oral); *Brewer* v. *State*, 7 Lea, 682. As a result of that defect, the incorporators at once became personally liable for the balance of the purchase price of the land conveyed to the supposed corporation. But defendants, conceding the defective acknowledgment, say that it was effectually cured, the charter made good, and all contracts and obligations of the corporation made valid, by the Act of March 10, 1890. Such, beyond ques-

tion, was the intent and meaning of that Act, whose language is as follows:

"*Be it enacted by the General Assembly of the State of Tennessee,* That all charters or articles of incorporation heretofore taken out under the general corporation laws of this State which were or have been acknowledged or proven before Notaries Public, are hereby ratified and confirmed, and shall have and possess the same validity and effect as if they had been acknowledged or proven before the County Court Clerk; and the acts, contracts, and obligations of all such corporations so organized shall have and possess the same validity, force, and effect as if the charters of such corporations had been acknowledged before the County Court Clerk." Acts Extra Session 1890, Ch. 17, Sec. 1.

Complainants deny, however, that this legislation is constitutional, and say that it cannot be held to operate so as to affect them or their rights in this case. The substance of the position is that, because of the invalidity of the charter on the day the land was conveyed to the corporation, the defendants then became personally liable for the payment of the purchase money notes; that such personal liability was a vested and fixed right of the vendors, which could not be taken away or impaired by legislative enactment, as would be the effect if the Act in question be applied in this case.

The constitutional provision upon which this contention is made is as follows: "That no retrospect-

ive law, or law impairing the obligation of contracts, shall be made." Const. Tenn., Art. I., § 20.

This does not mean that absolutely no retrospective law shall be made, but only that no retrospective law which impairs the obligation of contracts, or divests or impairs vested rights, shall be made. *Townsend* v. *Townsend,* Peck, 15 and 17; *Wynne* v. *Wynne,* 2 Swan, 205; *Collins* v. *Railroad Co.,* 9 Heis., 847.

It does not inhibit retrospective laws made in furtherance of the police power of the State; and, generally, it does not prohibit remedial legislation, nor stand in the way of statutes passed to cure some defect or omission in former proceedings or enactments, or in the case of parties attempting to comply therewith. *Ib.; Marr* v. *Bank,* 4 Lea, 585; *Knoxville* v. *Bird,* 12 Lea, 121; *Demoville* v. *Davidson County,* 87 Tenn., 223; *Munn* v. *Illinois,* 94 U. S., 113; *Beer Co.* v. *Massachusetts,* 97 U. S., 25; *Stone* v. *Mississippi,* 101 U. S., 814; Wade on Retroactive Law, Secs. 23, 257; 1 Kent, *456; 2 Story on Const., 674; Cooley on Const. Lim. (5th Ed.), 443, 448, 455–458; *Ewell* v. *Daggs,* 108 U. S., 150, 151; *Gross* v. *U. S. Mortgage Co., Ib.,* 488; *Satterlee* v. *Matthewson,* 2 Peters, 412; Sutherland on Stat. Cons., Secs. 206, 207.

We quote from each of three distinguished authors:

"A retrospective statute affecting and changing vested rights, is very generally considered, in this

country, as founded on unconstitutional principles, and consequently inoperative and void.    But this doctrine is not understood to apply to remedial statutes, which may be of a retrospective nature, provided they do not impair contracts, or disturb absolute vested rights, and only go to confirm rights already exist-ing, and in furtherance of the remedy, by curing defects, and adding to the means of enforcing exist-ing obligations.    Such statutes have been held valid, when clearly just and reasonable and conducive to the general welfare, even though they might operate in a degree upon existing rights—as, a statute to confirm former marriages defectively celebrated, or a sale of lands defectively made or acknowledged.''    1 Kent, *455, 456.

"A party has no vested right in a rule of law which would give him an inequitable advantage over another, and such rule may therefore be repealed, and the advantage thereby taken away.    To illustrate this remark, if by law a conveyance should be declared invalid if it wanted the formality of a seal; or a note, if usurious interest was promised by it; or if in any other case, on grounds of public policy, a party should be permitted to avoid his contract entered into intelligently and without fraud, there would be no sound reason for permit-ting him to claim the protection of the Constitution, if afterwards, on a different view of public policy, the Legislature should change the rule, and give effect to his conveyance, note, or other contract,

exactly according to the original intention. Such infirmities in contracts and conveyances are often cured in this manner, and with entire justice; and the same may also be done with defects in legal proceedings, occasioned by mere irregularities. When a Court or its officers, in a case of which the Court has full jurisdiction, have failed to observe strictly the rules of procedure which are prescribed for the orderly conduct of affairs, and, in consequence thereof, a party who was in no way injured by the irregularity, is nevertheless in position to take advantage of the error to avoid the proceedings, it is often not only just but highly proper that the Legislature shall interfere and cure the defect by validating the proceedings. And if this may be done in proceedings, which concern only private parties, it may be done in case of errors in the proceedings of corporations, and of public bodies. Retrospective legislation to cure their irregularities is not forbidden.'' 2 Story on Const. (5th Ed.), 674.

''If the thing wanting, or which failed to be done, and which constitutes the defect in the proceedings, is something the necessity for which the Legislature might have dispensed with by prior statute, then it is not beyond the power of the Legislature to dispense with it by subsequent statute. And, if the irregularity consists in doing some act, or in the mode or manner of doing some act which the Legislature might have made immaterial by prior law, it is equally competent to make the same im-

material by a subsequent law." Cooley on Const. Lim. (5th Ed.), 458.

Referring to the subject of legislative ratification, another learned author makes this remark: "Such subsequent ratification will not only legalize the existence of a corporation formed without authority of law, and authorize the association to act in a corporate capacity thereafter, but it may also cure the illegality of corporate acts performed before the act of ratification was passed, and render such acts as valid and binding as if authority to perform them had been previously granted by the Legislature." 1 Morawetz on Private Corp. (2d Ed.), Sec. 20.

A stipulation in the face of a note for usurious interest affords the maker a perfect defense to any action for the collection of the note; yet he has no such vested right in the defense or the contract or the usury statute, as that the latter may not be repealed, and the obligation made collectible by a retrospective law. *Ewell* v. *Daggs*, 108 U. S., 150.

So, likewise, a loan of money made in one State by a corporation of another State, though not collectible at the time because then contrary to the law of the former State, may be rendered collectible by a subsequent law. The latter law, though destroying a complete defense to any suit brought for the collection of the loan, does not impair the obligation of the contract. "It rather enables the parties to enforce the contract they intended to make." *Gross* v. *U. S. Mortgage Co.*, 108 U. S., 488.

Clearly, the Act of 1890 does not impair the obligation of any contract with complainants, for they had no contract with the individual defendants. Their contract was with the corporation; hence that Act, which gives life to the corporation, effectuates rather than impairs the obligation of its contract. No more does that Act divest or impair any vested right of complainants. They had no vested right in the defect in the charter of the Clifton Hill Land Company; hence, the cure or removal of that defect did not divest or impair any vested right of theirs. The right to sue the defendants personally was not a vested right in legal contemplation. It was but a consequential right, resulting from the disability of the corporation, and not a right flowing from any contract with the individuals as such. The mutual intention was to bind the corporation, not the incorporators, for the price of the land; and no vested right could arise contrary to that intention. A law which facilitates the intention of the parties to a contract, never impairs its obligation or divests or impairs any vested right thereunder.

As forcibly remarked by Mr. Justice Washington, in an early case: "It is not easy to perceive how a law which gives validity to a contract can be said to impair the obligation of that contract." *Satterlee* v. *Matthewson*, 2 Peters, 412.

Complainants had no vested right in the law which permitted only Clerks of the County Courts to take acknowledgments to charters, nor against defendants

on account of that law. Our conclusion is, that the Act of 1890 is valid, both as a retrospective and as a prospective law. Besides, if it were held that the Act in question can operate only as a prospective law, complainants would now be estopped to assert personal liability of the incorporators upon the ground that the charter of the company was originally invalid. The continued prosecution of their vendors' bill against the company, as a corporation, after the passage of that Act, must be assumed in law to have proceeded in recognition of that Act, and upon the idea that it had validated the notes sued upon. Complainants received those notes from the supposed corporation, as their vendee, April 14, 1887; held them continuously before and after the completed organization of the company, on June 9, 1887; collected interest on them from time to time; filed their vendors' bill against the corporation in April, 1889, and prosecuted the same to final decree in this Court at the September Term, 1892, when they obtained, against the corporation alone, the decree made the basis of the present action. This course of conduct, in Court and out, running through a period of more than five years, and continuing more than eighteen months after the charter of the company and its contracts had been expressly validated by the Legislature, conclusively estops them from now claiming and obtaining relief on any theory inconsistent with the validity of the corporation or of its notes for the land.

The case of *Broyles* v. *McCoy*, 5 Sneed, 603, is

not controlling in this case, because the personal liability there enforced was predicated upon a completed written contract, executed by the defendants before any steps were taken to procure a charter.

The third and last assignment of error—that which brings forward for consideration the second or alternate aspect of the bills—is as follows: "Again, treating this liability as that of the corporation alone, the Court erred in not giving decree against said individual defendants upon their stock subscriptions to said Clifton Hill Land Company. There was no valid payment of said subscriptions."

Since the case of *Wood* v. *Dummer*, 3 Mason, 308, decided by Judge Story in 1824, it has been the general doctrine of American Courts that the capital stock of a corporation is a trust fund for the payment of corporate debts; and that, in case of insolvency, stock subscribers are liable to creditors of the company for unpaid subscriptions, so far as required for the satisfaction of its liabilities. *Sawyer* v. *Hoag*, 17 Wallace, 611; *Ohio Life Ins. Co.* v. *Merchants' Ins. Co.*, 11 Hum., 31; *Wetherbee* v. *Baker*, 35 N. J. Eq., 501; *Sawyer* v. *Upton*, 91 U. S., 60; *Thompson* v. *Bank*, 3 Am. St. R., 797, and note p. 808; *Kelley Bros.* v. *Fletcher*, 94 Tenn., 1; Cook, S. and S., Sec. 199; 2 Morawetz, Pri. Corp., Sec. 780; 1 Beach, Pri. Corp., Secs. 113–116; Thompson's Liab. Stockh., Sec. 10; Taylor, Pri. Corp., Secs. 701–704; 2 Spelling, Pri. Corp., Sec. 784.

Shields *v.* Clifton Hill Land Co.

Conceding this doctrine, defendants say that it is available only to those persons whose debts were contracted after subscription made, and in reliance upon it, and that it cannot be successfully invoked by these complainants, because their debt was created before the capitalization of the company, and before any subscriptions to stock were made.

Counsel for complainants admit the facts stated, but dispute the legal proposition. They contend that the true reason of the doctrine is, that unpaid subscription to capital stock is the property of the corporation, liable in the last resort to the payment of all of its just debts; that, being such, it stands upon the same ground, with respect to creditors, as any other corporate property; and, like any other property, may be subjected, in case of insolvency, to antecedent and subsequent debts alike.

It is further said that if corporate creditors can be denied resort to stock subscriptions, because made after the creation of their debts, they may, upon the same reasoning, be denied resort to any other after-acquired property; that there is no difference, in this respect, between the liabilities of corporations and of natural persons; that, inasmuch, as in case of credit extended to a natural person, the creditor has a right to look not only to the property he then has, but also to all that he may thereafter acquire, the corporate creditor should have the same right; and, finally, that all property of natural or artificial persons, whenever or however acquired, un-

less expressly exempted by law, is liable for all valid debts of the one or the other whenever created.

Those are very forcible views, and, were the question a new one, we would adopt them as the surest means of doing justice in every case. The doctrine seems, from its inception, however, to have been rested on actual or presumed reliance by the creditor, at the time his debt was created, upon the then capital stock of the corporation for payment. *Wood* v. *Dummer*, 3 Mason, 308; *Adler* v. *Brick Co.*, 13 Wis., 60; *Allen* v. *Montgomery R. Co.*, 11 Ala., 437; *Wetherbee* v. *Baker*, 35 N. J. Eq., 501; *Sawyer* v. *Upton*, 91 U. S., 56; *Sawyer* v. *Hoag*, 17 Wallace, 611; *Hospes* v. *N. W. Mfg. & Cur Co.*, 5 Am. R. R. & Corp. Rep., 570; 2 Morawetz, Pri. Corp., Sec. 781; *First Nat. Bank* v. *Mining Co.*, 18 Am. St. R., 516 (S. C., 42 Minn., 327), and other cases too numerous to mention.

In the last case, the Court said: "While the Courts have not always had occasion to state the limitation upon the doctrine that 'the capital stock is a trust fund for the benefit of creditors,' yet we think that it will be found that in every case where they have impressed a trust upon the subscription of the shareholders, it has been in favor of creditors becoming such afterwards; and hence, fairly to be presumed as relying upon the amount of capital which the company was represented as having." 13 Am. St. R., 516.

In a late case, the Supreme Court of the United States said: "We have no doubt the learned Circuit Judge held correctly that it was only subsequent creditors who were entitled to enforce their claims against the stockholders, since it is only they who could, by any legal presumption, have trusted the company upon the faith of the increased stock." *Handly* v. *Stutz*, 139 U. S., 435.

But the rule of nonliability of stockholders for antecedent debts does not apply where the amount of capital stock is definitely fixed in the charter, for, in that case, the creditor is presumed to have contracted with reference to the charter capitalization. 2 Morawetz, Sec. 781.

The "trust fund doctrine," as thus far considered, may well be termed the American common law on the subject, originated, developed, and enforcible by the Courts of Equity in this country. Many of the States have statutes on the subject, some of which are merely declarative of that common law, some restrictive in their nature, and others more comprehensive and imperative. The Tennessee statute is in these words: "The amount of any unpaid stock due from a subscriber to a corporation shall be a fund for the payment of any debts due from the corporation; nor shall the transfer of stock by any subscriber release him from payment, unless his transferee has paid up all or any of the balance due on said original subscription." Acts 1875, Ch. 142, Sec. 5, p. 237; Code (M. & V.), § 1708.

This provision was properly incorporated into the charter of the Clifton Hill Land Company, and is binding on all stock subscribers. What does it mean? What is made a fund for the payment of debts? "Any unpaid stock." What debts are contemplated? "Any debts due from the corporation." "Any unpaid stock" means all unpaid stock, and "any debts due from the corporation" means all debts due from the corporation—that is to say, all unpaid stock shall be a fund for the payment of all debts of the corporation. No subscriber for unpaid stock can escape liability, and no corporate debt shall go unpaid, so far as the capital stock is concerned. The liability attaches to all subscribers; the security extends to all creditors. No subscriber whose stock remains unpaid can escape liability, and no creditor who has a valid debt can be denied his security. Nothing is said in the statute with respect to the time the subscription shall be made, nor as to the time the debts shall be created. No limitation is made in either case. The clear and plain meaning of the statute is that all unpaid stock, whenever subscribed, shall be a fund for the payment of all corporate debts, whenever created.

Under this statute, it is clear that all subscribers to stock in the Clifton Hill Land Company would. be individually liable, in a proper proceeding, for the debt of complainants to the extent that their respective subscriptions may be shown to remain unpaid. A similar statute was so construed

by the Supreme Court of Illinois in the case of *Root* v. *Sinnock*, 120 Ill., 350 (S. C., 60 Am. R., 558). See also 2 Morawetz, Sec. 870.

Some of the defendants, notably Catchings and Richardson, deny that they were ever subscribers for any part of the stock in the Clifton Hill Land Company, and all of them say that all the stock has been fully paid.

The proof on the issue of payment is, that certain of the defendants, collectively, furnished the aggregate sum of $35,000 in money, which was used by Lyerly in making the cash payment on the land before the Clifton Hill Land Company was actually incorporated; and that, on the ninth of June following the incorporation, the stockholders took the action indicated by the following entry upon the minutes: "On motion of John A. Hart, it was resolved that this company buy from the original purchasers of the Watkins farm all their interest therein, and pay them, in paid-up stock of this company, the sum of $250,000, and assume their liability of $90,000 as due Mrs. Watkins, the original vendor."

So far as the question of payment is concerned, this action of the stockholders can have no other meaning, in law, than that the company was to give those particular defendants $250,000 of paid-up stock for their equity in the land, or against the corporation, by reason of the fact that they had so furnished the $35,000 already mentioned. It

cannot mean in legal contemplation, nor was it in fact intended to mean, that such persons were selling the land itself to the company and taking as consideration therefor the $250,000 of paid-up stock; for, as we have seen heretofore, the land was already the property of the corporation, subject to the lien for unpaid purchase money. That the parties concerned might then reasonably have considered the land, incumbered as it was, as fairly worth $250,000 in cash, or even more, is satisfactorily established by the proof, hence there could be no doubt, in view of the settled rule that property needed by the company may be taken at a fair valuation in payment of stock subscription (*Kelley Bros.* v. *Fletcher*, 94 Tenn., p. 1), that if the subscribers had been vendors of the land, the stock was in fact fully paid; but whether the mere equity of the contributors of the $35,000 used for the cash payment could properly have been given so large a purchasing value is quite a different question. It is clear to our minds that the company had the legal right to issue full paid stock in extinguishment of that equity, yet the record fails to show that it was worth so much as $250,000.

But it is said that the question of overvaluation is not raised in the pleadings, and that, for that reason, it cannot be considered by the Court. It is plain law, that a contract whereby a corporation receives needed property in the payment of stock subscription, is presumed, in the first instance, to be

valid and binding upon all parties concerned; and that it must stand as made, and operate as intended, until impeached by appropriate pleading and proof. *Phelan* v. *Hazard*, 5 Dillon, 50; *Clow* v. *Brown*, 31 N. E. Rep., 362; *Coit* v. *Gold Amalgamating Co.*, 119 U. S., 345; *Kelley Bros.* v. *Fletcher*, 94 Tenn., 1.

The allegation in the original bill before us is as follows: "Complainants are informed and charge that those who subscribed for stock in the defendant company have paid very little upon their stock subscription, and perhaps some have paid nothing at all. Complainants are informed that one or more small assessments were made upon the stock subscribers, which were paid, at least in part, said stock assessment being levied for the purpose of collecting money from the subscribers to pay the annual interest due upon the notes held by complainants, Mrs. Watkins and Mrs. Shields, against said defendant company; and that, with this exception, none of said stock subscriptions have been paid in, and the same are due and owing to the corporation."

This is merely an allegation of nonpayment, and is not claimed to have been intended for more. It does not even refer to the transaction whereby the stock was paid, and can, by no construction, be taken as an impeachment of it. Hence, under the authorities last cited, the question of overvaluation cannot be considered, but the Court must assume, upon this record, that the equity of the subscrib-

11—10 P

ers in the land was worth as much as the par value of the stock, that being the price at which it was taken, and that the subscriptions are full paid. The question of pleading was elaborately considered in *Kelley Bros.* v. *Fletcher, ante, p. 1.*

Let the decree be affirmed.

---

### DISSENTING OPINION.

WILKES, J.   I cannot concur with the opinion of the majority in this case. The very late hour of the term at which the able and elaborate opinion of the majority was prepared and presented, will not admit of any elaborate presentation of my individual views of the question involved, having had only a portion of the morning to prepare this paper.

So far as the result of this case is concerned, these views have no value, as I stand alone, and I state them with the utmost deference for the views of the majority, but I deem it incumbent to briefly express these views in view of the fact that almost daily questions of a similar character are being presented to the Court in connection with the collapse of nominal, not to say fraudulent, corporations, and the winding up of boom speculations, in which promoters and parties interested seek to escape personal liability upon technical grounds.

I am of opinion that the individual defendants in this case are personally liable, as parties composing

the purchasing syndicate known as the Clifton Hill Land Company, for the balance of the purchase money for the Oakland farm, after exhausting the proceeds of the land upon which the lien was retained, and that complainants, under their pleadings, are entitled to a recovery.

This property, in my view of the case, was purchased by the syndicate when they accepted the Lyerly option previous to February 28, 1887, the date when that option expired. It was certainly purchased by some one during the life of that option, and it could not have been by the corporation, because no steps to organize that was taken until March 17, 1887, nor was there any organization thereunder, nor any stock subscribed until June 9, 1887. Until the latter date, the corporation had no officers, no agents, no stock, no life, no final determination to incorporate.

The syndicate became the equitable owner of the land, and its members equitably bound for the purchase money, whatever may have been their liability in an action at law for want of a direct promise on the part of each to pay.

The notes executed April 14, 1887, clearly indicate, to my mind, that the purchase was that of the syndicate, and the notes of the members of the syndicate, and not of the corporation, which then had no legal existence, no organization, no stock, nothing but a void charter not then accepted.

E. Watkins, at that date, was president of the syndicate, but not of the corporation, for he did not

become president of the corporation until two months afterward, and the note signed by him as president of the Clifton Hill Land Company, was the note of the partnership of that name, and not of the corporation which subsequently organized under that name. But if any doubt remains upon this point it is entirely removed by the action of the stockholders on June 9, 1887, when, on motion of John A. Hart, it was resolved that this company, that is, the corporation, buy from the original purchasers of the Watkins farm all their interest therein, and pay them therefor, in paid up stock of this company, the sum of $250,000, and assume their liability of $90,000, as due to Mrs. Watkins, the original vendor. It is clear from this, that the land was bought from Mrs. Watkins by the partners, and not by the corporation, and that the corporation bought from the promoters, and agreed to pay them in stock for the purchase.

With all due respect for the exceedingly able opinion of the majority, I think it proceeds upon an erroneous idea in holding that certain acts done and transactions made were the acts of the corporation, when, as a matter of fact, they were the acts of the individuals operating under the name of the Clifton Hill Land Company, as a partnership designation, before it was incorporated under the same name. In my view, the corporation, as such, did no act to connect it with this transaction until the ninth day of June, 1887. Up to that time,

all that was done was done as individuals, and not as a corporation. The change to a corporation was made June 9, 1887, when the shrinkage in value had set in, and it was important to interpose the corporation to shield from individual liabilities. No one but these promoters had any interest in the land, or had incurred a liability to Mrs. Watkins for the purchase money, up to that time.

We have not the opportunity to carefully analyze the pleadings in the two cases with a view of showing that complainants all the time have proceeded upon the idea of the original liability of the partners individually, supplemented by that of the corporation after it came into existence.

The substance of it all is, that complainants insisted all the time upon individual liability, and the main contention by them was that the subsequently formed void corporation could not relieve from this liability. I think there is an utter absence of proof that the defendants stipulated against individual liability, nor do I understand the opinion of the majority to so hold or intimate.

In this connection I remark that I can place but little weight upon the acts of Mr. J. A. Caldwell as working an estoppel upon complainants. If he was agent for them, he was at the same time agent and attorney for the defendants individually and as a corporation.

The formation of the corporation did not relieve the individuals, but the corporation assumed the debt

of the individuals, and, as to the creditors, became surety for the individuals.

In *Broyles* v. *McCoy*, 5 Sneed, 602, this Court said: "It is well settled that when an association which has existed as a mere copartnership, becomes incorporated, and the corporation then accepts an assignment of all the property of such association for the purpose of carrying out their object, they are primarily and jointly and severally liable for all the debts incurred before the act of incorporation. In such a case, the responsibility of the corporation for contracts previously made with the association does not become substituted so as to exempt the members from individual liability; and it does not change the case if the members of the company had it in view to procure a future Act of incorporation when it was first formed."

This case has been often approved in our own Courts and the Courts of other States, and is, I think, conclusive of this feature of the case.

I do not deem it important to dwell upon that feature of the case which seeks to hold the members or stockholders, upon the idea that the charter is void. Upon this point I virtually agree with the majority.

In the second place, I am of opinion that the individual defendants who were stockholders of the defendant corporation are severally liable upon their respective subscriptions to the capital stock of the corporation, in a sum sufficient to pay the balance

of the purchase money due the complainants, the said stock being for the most part unpaid.

The Act of 1875, Ch. 142, Sec. 5, p. 237, contains a provision in these words: "The amount of any unpaid stock due from a subscriber to the corporation, shall be a fund for the payment of any debts due from the corporation; nor shall the transfer of stock by any subscriber relieve him from payment, unless his transferee has paid up all or any balance due on said original subscription." Code, § 1708.

This provision is incorporated in the charter of this corporation, and is binding on all subscribers for stock. I think the language of the statute and charter is clear and plain, and that all stock, whenever subscribed, is liable for all debts whenever contracted. The charter virtually declares on its face, to the world, that when the stock shall be subscribed and paid, it will constitute a fund for the payment of the debts of the corporation. Independent of the statute, the same rule results under the general principles of equity and the trust fund doctrine. All unpaid original subscriptions are assets for the payment of debts. I need not consider the question where there is an increase of stock after the original subscriptions are paid. In this case, however, the stock was subscribed at the same time and by the same instrument under which the corporation assumed the debt. I think the fact abundantly shown that the capital stock of this company

had been fixed and subscribed before complainants extended credit to it, or at the time the contract was assumed by the corporation. We have neither time, nor would it serve any useful purpose, to dwell upon this feature of the case.

Upon the general doctrine of the liability of the stockholders for unpaid subscriptions, I understand that I am in accord with the majority, and that I differ only in the application of the doctrine to the facts in this case. The remaining question is whether the defendants are liable for any unpaid subscriptions. As I understand the opinion of the majority, they are not, because their stock has been paid in full in property which the stockholders agreed to receive in satisfaction of the subscriptions, and whether this was a *bona fide* actual payment cannot be questioned, inasmuch as the stockholders agreed to so regard it, unless the transaction shall be directly impeached for fraud by proper allegations in the bill. In other words, it matters not what fictitious values shall be placed upon property received in payment of stock, it will be treated as payment if the stockholders so regard it, and it cannot be questioned except upon an allegation of a fraudulent combination and purpose upon the part of the stockholders.

It is well settled that corporations may receive in payment of stock subscription property which it may lawfully purchase, and which is suitable and applicable to the purposes for which it was organized, but it must be taken in good faith, at its fair,

*bona fide* value. *Searight et al.* v. *Payne*, 6 Lea, 285; *Albitztigui* v. *Quadalupe Mining Co.*, 8 Pickle, 605.

The transaction must be free from fraud. The property must be of such character and value that the corporation would be authorized · to purchase it with money if the stockholders had first paid the amount of their subscriptions into the treasury of the company. It must be received at money's worth, and, if it have no settled and ascertained value, it cannot be received at all, unless under special circumstances. Morawetz on Cor., Secs. 425, 426, 428, and 825; Cook on Stockholders (2d Ed.), Sec. 13; *Camden* v. *Stewart*, 144 U. S., 105. The fraud most frequently practiced in such transactions is to put a grossly exaggerated value upon the property conveyed to the corporation. Mr. Cook, in his work on Stock and Stockholders, says that the method most frequently resorted to in schemes for issuing watered stock, or stock as paid up when it is not, is that of conveying to corporations property at an overvaluation. He further says that fraud of this character in issuing stock is the most difficult to prove and the least easy to remedy. Cook on Stockholders, Sec. 35 (3d Ed.). It has been repeatedly held, in cases where it appears that the overvaluation was intentional, that that fact alone was sufficient evidence of its fraudulent character, and made out a case for relief. Cook on Stockholders (3d Ed.), Secs. 45–47 (note

on page 72). In a case where property worth $64,000 was transferred in payment of stock to the amount of $300,000, the Court held, as a presumption of law, that the transaction was fraudulent. *Douglass* v. *Ireland*, 73 N. Y., 100. Where stock worth $100,000 was issued for property worth $50,000, in the absence of evidence to explain it and rebut the presumption of fraud, the Court held the transaction was fraudulent. *Boynton* v. *Andrews*, 73 N. Y., 93.

Indeed, this case will come within the doctrine laid down in *Camden* v. *Stewart*, where it is held that, if the property turned in is practically worthless, or is unsubstantial and shadowy in its nature, the Court will hold that there has been no payment at all, and that the stockholders are liable on the stock. *Camden* v. *Stewart*, 144 U. S., 104.

But it is said that, unless the transaction is impeached for fraud, directly and pointedly alleged in the pleadings, the question of overvaluation cannot be made effectual. In other words, the subscribers say: "We are stockholders, and have paid for our stock." "How have you paid it?" "In property." "Did you pay that property in at its fair cash value, as the statute prescribes?" "I need not answer that further than to say my associates agreed to receive it as payment, and it must stand as such, unless you impeach it for fraud on my part and that of my associates."

This rule may apply between the stockholders,

but it should not prevail as against creditors. I am ready to concede that fraud may be charged, and should be, in all proper cases, and the question thus raised; but I do not think relief can be denied because of the failure to charge fraudulent overvaluation, where the proof abundantly shows fraud or an excessive overvaluation. The plea in this case is payment. The burden of proving it is on the party setting it up. It devolves upon him to affirmatively show payment. This he can do by showing that money was paid. It may also be sustained, under the statute, by showing that property instead of money was paid; but it must be property at a fair cash valuation.

It is as much incumbent on the defendant to show the fair cash valuation of the property as it is to show that the property was paid. Until that is done the plea of payment is not sustained. As between themselves, the stockholders may agree that they will treat even a simulated payment as such, but as against creditors this should not be allowed to prevail. The true rule is to credit the stockholder with the fair cash value of his property upon his subscription, and require him to pay the balance in cash, at least to the extent of the demands of creditors. A margin may, and should, be allowed for honest differences of opinion as to values, but when an overvaluation is grossly excessive and intentionally made, even though there is no actual fraud, it is invalid as to corporation creditors, who

may proceed against the stockholders individually for their unpaid stock subscriptions.

The case of *Elyton Land Co.* v. *Birmingham Warehouse and Elevator Co.*, 92 Ala., 407 (S. C., 25 Am. State Rep., 65), is an able presentation of this doctrine, and, in my opinion, correctly lays down the law as far as this feature is involved. It is there held that any arrangement between stockholders and the corporation to issue stock as fully paid, though only partly paid in fact, either in money or property, and by which the corporation does not get the benefit of the full price of the stock in good faith, may be valid and binding between the stockholders and the corporation, but it is invalid as to creditors, and may be set aside at their instance, and full payment of the stock enforced for the satisfaction of corporate debts.

In that case, parties organized a corporation with a capital stock of $250,000, and gave in payment therefor, without actual fraud, a bond for title for land worth $50,000, and for which they had only paid $5,000 in part, the corporation assuming the balance of the purchase money. It was held that the stockholders were liable to the creditors of the corporation to the extent of the differences between the actual value of the property and the amount of their subscriptions. The statutory provision for payment of capital stock in property at its money value is substantially the same in Alabama as in this State. See the authorities cited in this case, and

the rule as laid down in Cook on Stock and Stock-holders sharply questioned.   In the Alabama case it was insisted that fraud should be charged and proved, but the Court said the statements of fact in the bill support the conclusions therein averred that the transaction by which payment for stock was attempted to be made was only colorable; that it was not really a payment, but had only the outward appear-ance without the substance of payment.   Such being the case, the individual defendants are still liable on their stock subscriptions to the extent that the at-tempted payment falls short of a *bona fide* compli-ance with the terms of the contract, and the allega-tions as to excessive valuations of the property were sufficient under the rules above stated.   To the same effect see *Crawford* v. *Rohoer*, 59 Md., 599; *Carr* v. *Lefere*, 27 Pa. State, 413; *Scoville* v. *Thayer*, 105 U. S., 143; *Jackson* v. *Traer*, 64 Iowa, 469 (S. C., 52 Am. Rep., 449); *Osgood* v. *King*, 42 Iowa, 478; *Douglass* v. *Ireland*, 73 N. Y., 100; *Witherbee* v. *Baker*, 35 N. J. Eq., 501; *Bailey* v. *Pittsburg Coal Co.*, 69 Pa. State, 334.   See also 78 Wis., 427; 23 Am. State Rep., 417; 3 Am. State Rep., 817; 124 N. Y., 302.

The cases relied upon in the opinion of the ma-jority of the Court are commented on in this case of *Elyton Land Co.* v. *Birmingham Warehouse and Elevator Co.*, 25 Am. State Rep., 65–83, and, I think, with fatal effect.

The case of *Kelley Bros.* v. *Fletcher*, 94 Tenn.,

1, decided at the present term, did not meet my approval, and I reserved the right to file a written dissent, and I make this my dissent in that case as well as in this on the points involved.

Now, in the case at bar we have this remarkable condition of affairs: The defendants plead payment of a subscribed capital stock of $250,000. To sustain this, they show they have actually paid $35,000 in cash, and have transferred to the corporation property which had been bought for $125,-000, and on which there was an incumbrance of $90,000, with only $35,000 paid in cash. It is well to remember that the stockholders do not assume this incumbrance of $90,000, but attempt to shift it to the corporation as a debt of the corporation. Even if the property had not depreciated, then the defendants would be in the attitude of paying up their capital stock of $250,000 with $35,000 in actual money, and the property actually put in as payment was thus overvalued, even on its "boom price." But it abundantly appears that, when this transaction took place, the property had already depreciated more than the cash payment. The boom had collapsed, and the shrinkage was on in full vigor, and to the full extent of the cash payment; so that we have these gentlemen, who bought this property as individuals, putting into a corporation for $250,000, not the property itself, but only their equity in it arising out of the $35,000 cash advanced upon it, which, in view of

the shrinkage, was absolutely nothing.    This does not constitute payment, and is, in my view, a clear evasion of the statutory requirement.

It is said that some of the parties did not intend to, nor did they, actually subscribe for stock, but they were under the impression that they were only stockholders to the amount actually paid in on the cash payment.    And yet, these same parties, after the cash payment had been made, paid assessments, and knew that a balance was to be paid on the purchase money.    Suppose this $90,000 of purchase money unpaid had been actually paid afterwards, would these parties have insisted that they had no further stock interest by virtue of such payment, but that their stock was still only the amount of the cash paid in?

I am thoroughly convinced that complainants in this case are entitled to their recovery in this case on the best and safest rules of law and equity.    It was said in argument that it would be inequitable to hold these defendants, all of whom are business men of the 'highest order, liable for the fictitious value of this property, depending on the boom inflation of value.    But it is equally against good conscience to deprive these ladies, who are not prominent business men, of the price which the proof shows they could have realized from the property from other parties during the continuance of the boom, but which they were prevented from receiving by the existence of this contract with the defendants.