Collier v. Railroad.

W. A. COLLIER *v.* UNION RAILWAY COMPANY

and

STATE, *ex rel.* WELLFORD, *v.* UNION RAILWAY COMPANY.

(*Jackson.* April Term, 1904.)

1. CORPORATIONS. Railroad charter must name the termini.
It is beyond doubt essential to name the termini of any proposed railroad in its charter, in order to make that charter valid. (*Post, pp.* 104, 105.)

Code cited and construed: Sec. 2412 (S.); sec. 1891 (M. & V.)

2. SAME. Charter of commercial railroad must name the termini, but need not describe route.
The charter of a commercial railroad need not contain any description of the route, but only the termini; and its route may be generally, and need not be definitely, stated in its charter. In this respect, it differs from the street railway. (*Post, pp.* 105, 112.)

Code cited and construed: Sec. 2412 (S.); sec. 1891 (M. & V.).

Case cited and approved: Railway v. Africa, 100 Tenn., 44.

3. SAME. Railroads incorporated under statutes can condemn property under eminent domain laws.
Only such railroad corporations as are chartered under our general incorporation statutes (Acts 1875, ch. 142, sec. 6, and amendments—Shannon's Code, sec. 2414-2425) are authorized to condemn property for their purposes under the eminent domain laws. (*Post, p.* 107.)

Code cited and construed: Sec. 2414-2425 (S.); sec. 1893-1902 (M. & V.).

Acts cited and construed: 1875, ch. 142, sec. 6.

Collier v. Railroad.

**4. SAME.** Words "at or near" in railroad charter designating railroad's terminus must receive a reasonable construction.

The words "at or near" used in a railroad charter to designate the railroad's terminus are indefinite, and must receive a reasonable construction. (*Post, p.* 109.)

Cases cited and approved: Iron Works v. Railroad, 5 Allen, 221; Railroad v. Railroad, 1 Gray, 340, 367; Purifoy v. Railroad, 108 N. C., 100.

**5. SAME.** Words "McGee's station" used in railroad charter to designate terminus mean a locality, and not a point.

The words "McGee's station," used in a railroad charter to designate the railroad's terminus, should be held to mean a locality, and not a fixed and definite point. (*Post, p.* 109.)

**6. SAME.** Charter must be authorized by law.

No charter can be valid that is not authorized by law. (*Post, p.* 111.)

Cases cited and approved: Ex parte Burns, 1 Tenn. Chy., 83-93; Ex parte Chadwell, 1 Tenn. Chy., 95; Heck v. McEwen, 12 Lea, 104.

**7. SAME.** Statutory form of charter is essential and requisite.

The statutory form of charter of incorporation must be followed, for the matter of the form prescribed by the statute is made essential. (*Post, p.* 111.)

**8. SAME.** Statutory requirements must be complied with.

What the statute requires to be done in order to complete the organization of a corporation as a body politic are mandatory and essential, and, unless they are all substantially done, the charter is void and the incorporation is incomplete. (*Post, p.* 111.)

Cases cited and approved: Brewer v. State, 7 Lea, 682; Mayor v. Ward, 16 Lea, 27; Shields v. Land Co., 94 Tenn., 146.

113 Tenn—7

Collier v. Railroad.

9. **SAME.** Same. Courts cannot dispense with statutory requirements, or supply statutory provisions.

The courts have no power to dispense with the statutory requirements or to supply statutory provisions, whatever may be the benefit, convenience, or necessity. (*Post, p.* 112.)

10. **SAME.** Railroad may be circular or polygonal in shape, with initial and final termini at same place.

Under our general incorporation statutes (Acts 1875, ch. 142, sec. 6, and amendments thereof—Shannon's Code, sec. 2412), there may be incorporated a railroad of reasonable length, embracing within itself a reasonable area, such as the limits of a city, and the road may be circular or polygonal in shape, with its final terminus at the same place as its initial, where the several connecting routes, and the intermediate points or termini are named in the charter. (*Post, pp.* 110-116.)

Code cited and construed: Sec. 2412 (S.); sec. 1891 (M. & V.).

Acts cited and construed: 1875, ch. 242, sec. 6.

Case cited and approved: State v. Martin, 51 Kan., 462.

11. **SAME.** Route of railroad through a city must be designated in its charter.

The route of a commercial railroad through a city, as well as that of a street railway, must be designated in its charter, so as to obtain permission and concession from the city to occupy the streets over which it is intended to build the road. (*Post, p.* 116.)

12. **SAME.** Amendment to charter extending route of an incorporated railroad company.

Under our general incorporation statutes (Acts 1875, ch. 142, sec. 19, and Acts 1897, ch. 116), an incorporated railroad company may obtain the right and power to extend its road over new and additional routes by procuring an amendment to its charter, describing the proposed additional routes with some degree of particularity and detail, and giving the termini of each. (*Post, pp.* 117, 118.)

Collier v. Railroad.

Acts cited and construed: 1875, ch. 142, sec. 19 (Shannon's Code, secs. 2028 and 2029); 1897, ch. 116.

**13. SAME.** Belt line. railroad that is a commercial railroad entitled to benefits of eminent domain laws.

A circular or polygonal railroad encircling a city, usually called a belt line, whose charter provides for the construction of a railroad similar to all other commercial railroads, and obligates it to do a general railroad business, both as to freight and passengers, but the chief purpose of which is to switch cars from one road to another, and from the various industrial enterprises to the several railroads, and back again, to receive freight on the line of its road, and to give bills of lading over its own and other roads to any part of the world, though passengers may rarely, if ever pass over its line, is a public use and a public necessity in the sense of the eminent domain laws, and, as such, it is entitled to exercise the power of eminent domain. (*Post, pp.* 117-122.)

Cases cited and approved: State v. Martin, 51 Kan., 462; Reisner v. Strong, 24 Kan., 410.

Case cited and distinguished: Freight Co. v. Memphis, 4 Cold., 419.

**14. SAME.** Terms "public use" are flexible under eminent domain laws.

The terms "public use" are flexible, and vary and expand with the growing needs of a more complex social order, and what would be a public use in the sense of the eminent domain laws is illustrated. (*Post, pp.* 122, 123.)

Cases cited and approved: Ryan v. Terminal Co., 102 Tenn., 111; Stewart v. Railroad (Minn.), 68 N. W., 208, 33 L. R. A., 427.

**15. SAME.** Deviation of railroad from charter route is permissible, when; condemnation, under eminent domain laws, for deviated route.

Deviations in the construction of a railroad from the route designated in its charter are allowed according to the necessities

of the road, the physical surroundings, and other circumstances entering into railroad building, such as the prevention of the destruction of mill property, the making of proper grade crossings, the minimization of impediment to travel, and the like, and condemnation proceedings under the eminent domain laws for the deviated route are not void, because of the deviation. (*Post, pp.* 123-126.)

Case cited and approved: Railroad v. Campbell, 109 Tenn., 667.

16. **SAME.** Injunction against railroad improperly occupying a public road, but condemnation proceedings are not affected thereby.

A railroad improperly occupying a public road, by running longitudinally on it, may be enjoined in a proper proceeding, but such occupation is immaterial in a condemnation proceeding to appropriate the land of a third person situated at a different place. (*Post, p.* 126.)

Code cited: Sec. 1879 (S.).

17. **EMINENT DOMAIN.** Quantity of land to be taken is left to the jury, when.

The amount of land to be taken in a condemnation proceeding is left to the determination of the jury, even if the court could itself determine the amount to be taken, where the order appointing the jury directs that in estimating and assessing the damages the jury will give the cash value of the ground, and set apart by metes and bounds a sufficient quantity of land for the purposes intended, not exceeding the amount prayed for in the petition, and the jury in its report set aside one hundred feet, which was the amount asked for in the petition. (*Post, pp.* 126, 127.)

18. **SAME.** Writ of possession may be awarded at a term subsequent to the confirmation of the jury's report.

Where in condemnation proceedings the court fails to award the writ of possession at the term at which the report of the jury

Collier v. Railroad.

of view is confirmed, it can award such writ at a subsequent term. (*Post*, *p*. 127.)

19. **SAME.** Same. Writ of possession awarded by supreme court, or cause remanded for that purpose.

In such case, if the court below has lost the power to award the writ of possession, the supreme court will either award the writ or remand the cause to the court below for that purpose, where the condemnation is proper. (*Post*, *p*. 128.)

20. **CORPORATIONS.** Railroad does not forfeit charter by sus pension, where there is no abandonment.

A railroad corporation does not forfeit its charter rights by sus- pension of work and operations for a number of years, where the project is not abandoned, but the contemplated road is ex- tended and built as soon as the funds are procured. (*Post*, *pp*. 128, 129.)

---

FROM SHELBY.

---

Appeal from the Circuit Court of Shelby County.— J. P. YOUNG, Judge.

COLLIER & COLLIER and CARROLL, MCKELLAR, BULL- INGTON & BIGGS, for plaintiff.

MCFARLAND & CANADA and WRIGHT, PETERS & WRIGHT, for defendant.

---

MR. JUSTICE WILKES delivered the opinion of the Court.

This is a proceeding to condemn land for railroad purposes. The defendant company claims to be a railroad corporation chartered under general incorporation act 1875, p. 232, c. 142, section 6 (Shannon's Compilation, sections 2414 to 2425, inclusive), and other sections bearing upon the question of corporation charters and the amendments to these original acts.

Collier and wife defend upon the ground that the charter under which the corporation is organized does not conform to the provisions of the act, and that the act and charter do not authorize the construction of such a road as is being built under it.

Our statutes provide for the formation of corporations by the following general provisions (Shannon's Compilation) :

"Sec. 2024. Private corporations may be formed and charters obtained by them in the manner and for the purposes hereinafter provided.

"Sec. 2025. Any five or more persons, over the age of twenty-one, desiring to form a corporation for any of the purposes in this chapter mentioned shall copy the form of charter adopted to the purpose, filling the necessary blanks, and append to the same an application in these words: 'We the undersigned apply to the State of Tennessee, by virtue of the laws of the land, for a charter of incorporation for the purposes and with the powers declared in the foregoing instrument. Witness our hands ———— day of ————.' "

Section 2026 provides, in substance, that the instru-

ment, when probated as provided in section 2542, with application, probate, and certificates, is to be registered in the county where the principal office of the company is situated, and also registered in the office of the secretary of state, and a certificate of registration given by the secretary of state under the great seal of the State, and it shall, when registered in the register's office of said county, with the facsimile of said seal, complete the formation of the company as a body corporate, and the validity of the same in any legal proceeding shall not be collaterally questioned.

The contention is that the provisions of the act must be complied with before the corporation becomes perfect and valid, and, unless they are complied with, the charter is invalid and void.

Section 2412, Shannon's Compilation, provides as follows: "The charter of a railroad or railway company shall be as follows: 'Be it known that ———— and ———— are hereby constituted a body politic and corporate by the name and style of (here insert the name) for the purpose of constructing a railway from ———— in the county of ———— to ———— in the county of ————.' "

The charter in controversy was obtained in 1886. An amended charter was obtained in 1902.

The first criticism made is that a charter for any railroad authorized by the act must set forth the termini of the road proposed to be built, and that a charter which specifies only one terminus provides only for a circular

route, beginning at and returning to the same point, and is therefore void. And it is insisted that the charter in the present case names no termini such as the act contemplates and requires, or, if it names any, it is only one terminus, which is made the beginning and ending point.

The charter in controversy provides that certain persons (naming them) "are hereby constituted a body politic and corporate by the name and style of the Union Railway Company for the purpose of constructing a railway from some point on or near the present southwestern limits of the taxing district of Shelby county, thence eastward on or near the southern limits to a point on or near the southeastern limits of said taxing district, thence northwardly on or near the eastern limits of the taxing district aforesaid to some point on or near the northeastern limits of said taxing district, thence westwardly on or near the northern limits of the said taxing district, thence southwardly by the most practicable and feasible route to the beginning."

It is insisted that in this description no terminus is named, or, if any is named, there is only one, which is both the beginning and end of the route.

On the other hand, it is contended that the two termini may be in one and the same place, and that there may be any number of termini, and that the charter in question does provide for a number.

There can be no doubt but that it is essential to name

the termini of any proposed railroad in its charter, in order to make that charter valid.

The route of a commercial road may be generally, and need not be definitely, stated in its charter. In this respect it differs from a street railway, as is explained in the case of *Citizens' Street Railway* v. *Africa*, 100 Tenn., 44, 42 S. W., 485, 878. Hence the form of charter prescribed for commercial railways need not include any description of the route, but only the termini.

In connection with this criticism it is said that the road which is being constructed under this charter is not such as is authorized by it, but that it is being attempted, under a charter intended for commercial railroads, to construct and operate what is called "a belt line railroad."

The Union Railway Company made various contracts and agreements with the city of Memphis, in which it styled itself "a belt line railway;" and in a petition to the county court of Shelby county on April 19, 1886, it stated that the object of its charter was to authorize the building and operation of what is commonly known as a "belt line railway," to connect the various lines of railways now entering or hereafter to enter into that city, and in its articles of agreement with the city it is stated that its principal object is the building of a belt line in and around said taxing district.

Several officers of the company were examined in regard to the character of the road, and in regard to its termini.

Mr. Brinkley, at one time its president, upon being pressed for a direct answer as to whether the road had any terminus, answered: "It has none, or a great many, according to the view you take of it; and you might say it has many termini, and no terminus."

Mr. Fleming, the present president of the road, when asked as to its termini, replied that he knew nothing about it, except the charter; and he proposed to read that in reply to the question. He stated further that there were six different routes; and when asked to give the termini of the road, as indicated in its original charter, he replied: "I don't know. I can give my impression of it."

Mr. Davant, a leading railroad man of Memphis, states that his understanding was that the Union Railway Company was a belt or terminal railway.

To the same effect is the testimony of Mr. Buckingham, one of the directors.

These gentlemen say that, in their view of the matter, the term "belt railway" or "terminal railway" has no particular significance to distinguish it from an ordinary commercial railway.

We think we need not debate the question whether the proposed road is a belt road or terminal road, or not, as counsel for the railway company insists that it is not a belt road or terminal road, as contradistinguished from the road which is authorized by the statute we have referred to, to wit, section 6, c. 142, p. 238, Acts 1875, and its amendents.

Collier v. Railroad.

The crucial question in the case is whether the road which is being constructed is authorized by the act referred to, and whether its charter conforms to that act, and whether the road conforms or intends to conform to that charter.

It is only such road that is authorized to condemn property for its purposes under the exercise of eminent domain.

We need not, therefore, discuss Acts 1893, p. 15, c. 11, which authorizes the creation of railroad terminal corporations, as the defendant railroad company does not claim any authority or right to act under that law.

The original charter of this company, as before stated, was granted in 1886.

The line of the road along the southern limits of the city was definitely located, and some work had been done upon it soon thereafter. This was done under a contract with the taxing district of Shelby county of date January 7, 1890. No other portion of said route was then specifically located, but the general location was, as described in the charter, on or near the then city limits. The eastern and northern lines were not definitely located.

A second contract was made with the city in November, 1890, but the route was not changed, and remained as originally provided for until the charter was amended in 1902.

In the meantime the city of Memphis had extended its limits far beyond what they were in 1886 and 1890, and

the original route designed would have run, not around, but through the city, and through one of its most populous portions.

The city in 1902 was not willing to permit this, nor were the residents along the route willing to allow it; and a new contract was made that the road should be constructed outside of the eastern and northern limits, as then existing, and also might be extended along the wharf in front of the city, so as to make it a complete road around the city.

It was to meet this changed condition of affairs that the new charter was obtained, locating the line so as to go around the city by extended lines, and reach the initial or beginning point, as at first contemplated.

It is said that, in making the location under the amended charter, route No. 1 does not connect with the route No. 1 laid out in the original charter at McGee's station. The calls of the two routes do connect, as appears from the contracts made with the city; that is, the route No. 1 under the amended charter calls to commence at the terminus of the road chartered where that terminus is located by the contract with the city; that is, in the right of way of the Southern Railroad at or near McGee's station.

The argument is, however, that, when the city made contracts Nos. 1 and 2, the limits of the city only extended to Robeson avenue, and not to McGee's station, or the crossing of the Southern Railroad, and it had no power, therefore, to fix the route beyond Robeson ave-

nue, its eastern limit. We may grant this to be true, but the road, so soon as it crossed the city line, came into the rural districts, and could locate its own line, which it did to the Southern crossing, making that a temporary terminus. The amended route then begins at this terminus, calling for it, and continues as before stated.

We think this point in the right of way of the Southern Railroad meets the charter requirement of being a point "on or near the then southeastern limits of the taxing district," and it also meets the requirement of being "at or near McGee's station."

These words "at or near" are indefinite and must receive a reasonable construction. Lewis on Eminent Domain, section 257; Redfield on Railways, p. 413; *Fall River Ironworks* v. *Old Colony R. R.,* 5 Allen, 221; *Boston Railroad* v. *Midland R. R.,* 1 Gray, 340, 367; *Purifoy* v. *Railroad,* 108 N. C., 100, 12 S. E., 741.

In addition, McGee's station should be held to mean a locality, and not a fixed and definite point.

The route as laid out in the original charter calls, in general terms, to start at a point on or near the present southwestern limits; thence eastwardly to a point on or near the present southeastern limits; thence to a point on or near the present northeastern limits; thence to a point on or near the present southwestern limits; thence to the beginning; designating the then existing limits as the localities upon which the route is to be located.

The amended charter of 1902 provides for six new or

additional routes: No. 1 commencing at or near McGee station, at the eastern terminus of the road as located January 7, 1890, and November 6, 1890, and running around the limits of the city as it then existed until it reaches a point in the city limits at Cooper avenue; thence to a point not less than 300 feet north of Summer avenue; the other routes calling to commence at different points on No. 1 and its extensions, and to run into different localities to different points as the end of the routes, but the final terminus is the same as in the original charter.

The original charter contemplated a route about four miles in length. The amended charter provides for one about seventeen miles long.

The property of Collier and wife does not lie along the route as prescribed by the original charter of 1886, but is reached only by the lines laid off under the amended charter; and hence we must inquire into the validity of the amended charter, and the right of the railroad company to exercise the right of eminent domain thereunder, and at this particular place in its route.

We think there are three principal questions involved in the case: First, whether the act of 1875, and the acts amending same, authorize the construction of a road extending around the limits of the city, from point to point, and returning to its initial or beginning point; second, whether there is any amendment to the act of 1875 which would authorize the construction of the six additional routes prescribed by the charter of 1902; and,

third, whether a railroad constructed in this manner is a public use, and entitled to exercise the right of eminent domain.

We proceed to consider the first of these questions, as to whether or not the general incorporation law of 1875, or the amendments to it, authorize the construction of a circular road; that is, a road having both termini at the same place, and extending from point to point, in a circular shape, around the limits of the city.

Clearly, no charter can be valid that is not authorized by law. *Ex parte Burns,* 1 Tenn., Ch. 83-93; *Ex parte Chadwell,* Id., 95; *Heck* v. *McEwen,* 12 Lea, 104.

We think it is essential that a road should have termini, and that they must be named in the charter, in order that it may be a legal corporation.

The act prescribed the form, and requires that it be copied, and this form must state the termini. The statute, having required a form, makes that form a necessity; and, having prescribed the matter of the form, that is made essential.

The things which a statute requires to be done in order to complete the organization of a corporation as a body politic are mandatory and essential, and, unless they are all substantially done, the charter is void and the incorporation is incomplete. *Shields* v. *Clifton Hill Land Co.,* 94 Tenn., 146, 28 S. W., 668, 26 L. R. A., 509, 45 Am. St. Rep., 700; *Brewer* v. *State,* 7 Lea, 682; *Mayor* v. *Ward,* 16 Lea, 27.

But it is said that, while termini are necessary to be

stated, yet the initial and final termini may be the same point, or rather, the beginning and ending may be the same point.

It has been held that the route of a commercial road need not be specified in its charter. If it is to pass over streets of a city, the consent of the city must be obtained, and, in order to do this, it is necessary to define the route, and obtain the permission of the city to occupy the same.

It is conceded that the legislature might authorize the charter for a circular railroad returning to its initial point, but it is insisted that it has not done so.

The question is not, ought such a road to be provided for? but, has it been authorized?

No matter what the benefit may be, no matter what the convenience may be, no matter what the necessity may be, the courts have no power to dispense with the statutory requirements, or to supply a statutory provision, to meet the ends which the legislature might have reached if it had been called to its attention.

We are referred to the case of *State* v. *Martin,* 51 Kan., 462, 33 Pac., 9, as holding that such circular road may be chartered without termini. This will, of course, depend largely upon the statutes of Kansas.

By the statutes of Kansas, the articles of incorporation of a railroad company are required to show (1) the kind of road proposed to be constructed; (2) the places from and to which it is to be constructed; (3)

the counties through which it is proposed to run; (4) its estimated length.

In a *quo warranto* proceeding, in the case referred to, brought to vacate the charter, as being unauthorized by law, the attorney-general insisted that the places from and to which the road intended to run necessarily required termini or two termini but the court held to the contrary, and sustained the charter of the road, as being authorized by the statutes of the State.

Upon this feature of the case, the attorney-general urged against the legality of the road all the objections that have been urged in the present case; and they were fully considered by the court, and disposed of in a lengthy and exhaustive opinion.

We quote from this opinion as follows: "The statutes of Kansas provide that the charter of a road company shall state the kind of road, the places from which it is intended to run, the counties through which it is intended to run, and the estimated length of the road."

Continuing, the court said: "The argument is that section 7 requires the charter to state the places from and to which the road is intended to run, and hence the road must be longitudinal, rather than circular; extending from one place or neighborhood to another, so as to have at least two termini. It is true, there is no express provision for the building of circular railroads, nor do we find any requiring that only longitudinal lines shall be projected and constructed. We find no limita-

113 Tenn—8

tion in the statutes with reference to the direction or course in which railroads shall be built. Nor do we find that any such limitation can be reasonably inferred from the provisions of section 7. The statute does not provide that the road shall be built from a town or city in one county to a town or city in another county, nor does it require that the road shall be of any prescribed length. It simply provides that the places where it is intended that the road shall begin and end shall be stated in the charter."

In that case, as well as this, it was conceded that the road need not run from a terminus in one county to a terminus in a different county, but both termini might be in the same county, and the length of the road was not material.

The provisions of the Kansas statute are substantially the same as our statute with regard to the termini.

We can see no valid reason why, under our general acts relating to the incorporation of railroads, a number of intermediate towns or cities, or a number of intermediate points in a county or city, may not be designated as intermediate termini upon the route of the road.

While the route of a commercial road need not be stated, there is no reason why it may not be done, nor why a number of intermediate routes from point to point may not be joined into one continuous road. It may be likened to so many boundaries of a farm or tract of land, with a number of courses and distances of different di-

Collier v. Railroad.

rections and lengths, but finally the closing course and distance coming back to the initial point.

To illustrate further, we can see no reason why a charter would not be valid if it should name as its route for a commercial railroad Memphis to Bolivar, from Bolivar to Jackson, from Jackson to Union City, from Union City to Covington, and from Covington to Memphis, the initial point.

Nor can we see why such route should not be circular in form as well as a polygon, with many sides, so as to reach from one terminus to another by the most feasible route, if its charter so specifies with reasonable certainty.

It is argued that to allow this would be to permit a road to start at any given point and make a circle around a city, or even around the limits of the State, returning to the same point.

We do not see why this might not result in any event, under the general incorporation act, unless we hold that a charter may not be framed to run from one town to another, and from the latter to another, and so on, until the last route ends at the beginning point.

But whether this be true or not, to the extent stated, we think that a line may be made of reasonable length, and embrace within itself a reasonable area—such, for instance, as the limits of a city—if the several connecting routes are named, each having termini. In such a case the final line or route would have two termini, one of which would be the beginning point.

As to the original charter, it may be held that it provides for four routes, each having distinct generally designated termini, and the amended charter provides for six routes, each having distinct termini; the final termini in each case being the initial point.

We are of opinion, therefore, that the fact that the road is somewhat circular in form or shape, or a polygon with many sides, and its final terminus at the same place as its initial, does not render the charter void, in as much as intermediate points or termini are named which designate the general route, but that such a road, if a public use and public necessity, is authorized by the act of 1875, and the amendments thereto.

In building its line through the city, the road must necessarily designate its route, so as to obtain permission and concessions from the city to occupy the streets over which the road is intended to be built; and the rule as to the designation of a route for a commercial road through the rural districts does not apply when the line is to be built over the streets of a city, to wit, that no route be named.

As to the amendments, we think we need only consider the act of 1897, p. 271, c. 116, which provides as follows: "Be it enacted by the general assembly of the State of Tennessee, that the stockholders of any corporation, organized under a charter obtained under the provisions of the act entitled 'An act to provide for the organization of corporations,' passed March 18, 1875, approved March 23, 1875, or organized under a charter obtained

under an act amendatory to said acts subsequent thereto, who may desire to change the name of such corporation, increase its capital stock, or obtain any power granted, either by said chapter 142 of the Acts of 1875, or by any act amendatory or subsequent thereto, shall have the right to do so under and in the manner provided by section 19 of said chapter 142 of the Acts of 1875, which provides for the amendment of charters, granted by the legislature, and with the like effect as therein provided," etc.

Said section 19, p. 257, of chapter 142 of the Acts of 1875, prescribes the following as the form under which the amendment shall be applied for: "We the undersigned, comprising the board of directors of the [Union Railway Company] apply to the State of Tennessee, by virtue of the general laws of the land, for an amendment to said charter of incorporation, for the purpose of investing said corporation with the power [of constructing, maintaining, and operating a railroad along and over the following routes, which are in addition to the route already granted to it by its charter]," etc.

This form was copied, as we have set out, and then follows the six additional routes already spoken of, described with some degree of particularity and detail, and giving the termini of each route.

We are of the opinion that if the railroad needed any additional power to construct its line along these six routes, or either of them, it was conferred by this amended charter, granted the third day of June, 1902, and that

this amended charter conforms to the requirements of the statutes of 1875 and 1897, to which we have referred, and that under its amended charter the road is authorized and given power to construct its lines over these routes, or any one or more of them, so as to reach its terminus or beginning point, provided the road is a public use and a public necessity; and, if it is such public use and necessity and authorized by law, it has the right to exercise the right of eminent domain.

The obtaining by amendment of power to extend the road over new and additional routes is covered by the words and meaning of this statute.

We proceed, therefore, to inquire whether the road is a public use and public necessity, or whether it is a mere private enterprise, or an enterprise which does not subserve a public use.

The charter itself provides for the construction of a road similar to all commercial railroads, and it contains provisions similar to those imposed upon all other commercial railroads in the State. So far, then, as the provisions of the charter are concerned, its purpose is to construct a railroad similar to all other commercial roads.

The testimony of its chief officers is taken, and they state that it is their purpose to build a road conforming in every essential respect to the provisions of its charter, and that they intend and expect to do all and every kind of business, and to engage in all traffic, freight and passenger, to the same extent and in the same manner as

any commercial road; and they point to the fact that, if they failed to do so in any particular, they may be compelled to do so by the provisions of their charter and by the general law of the land.

It is admitted by these officers that the bulk of its business will be the transfer of loaded cars from one railroad to another, and from the various industries to the several lines of roads centering in the city of Memphis. But it is said that it does not propose to discriminate against any one, or to restrict the business of the corporation to anything less than is performed by the ordinary railroad company.

Upon this feature of the case, the case of *State* v. *Martin,* supra, is also directly in point. In that case it was said: "Even the averments of the plaintiff do not show that the proposed use of the road is not a public one. Besides switching cars from one part of the city to another, it is alleged that the road is to be leased to other railroad companies for terminal facilities. Nothing is stated which shows that the companies to which the road is intended to be leased will not afford transportation to all, or to all who under ordinary circumstances would be entitled to such service. The convenience or necessity of belt or terminal roads in crowded and populous cities is well understood, and has been frequently demonstrated. A single road which reaches a union and other depots, as well as warehouses and elevators and other places in the city, is made to serve all the railway companies operating to and from the city, when it would

Collier v. Railroad.

be impracticable, and perhaps impossible, for each of the companies to secure an entrance, and build its own line to the depots, stations and storehouses in all parts of the city where railroad service is required. By this means unnecessary roads and expenses are avoided, and the facilities and the conveniences to the public are greatly enlarged. Every unnecessary mile of railroad tracks adds to the cost of transportation, and, as the public which uses these roads is required to bear the burden of this extra cost, it is clearly in the interest of the public that a terminal road which affords transportation to all companies and people should be constructed and maintained. The fact that this proposed road is to unite at the State line with a Missouri corporation gives no ground for complaint. Neither is the alleged purpose of the defendant company to lease its line to other railroad companies a valid objection to its exercise of the powers and privileges of a railroad corporation. [Both of these things were authorized by the Kansas statutes.]

"Again, it is said that the Atchison Union Depot & Railroad has only a short terminal line, designed and constructed for the purpose of furnishing the railroad companies which enter the city with access to the union depot, and facilities of interchange of traffic. It was contended that such a corporation was not a railroad company, within the meaning of the statute, which might exercise the right of eminent domain. The validity of the corporation, and its right to exercise the power

of eminent domain, has been sustained.  *Reisner* v. *Strong*, 24 Kan., 410.

"Again, it is said that declaration in the charter of the defendant company and the allegations of the petition sufficiently show that it was organized as a railroad company under the general law, and that it is designed mainly to serve the public as a common carrier. It is not necessary at this time to determine whether such a company, operating through a city, must accept passengers at every crossing, and furnish the facilities which street railroads are designed to furnish. Neither need we determine whether all of the company's lines and branches must be designed and used for the transportation of both passengers and property. The corporation being public, it cannot avoid the performance of any duty which it owes to the public. If, from the allegations of the petition, it can be inferred that the defendant company intends at some future time to neglect the performance of its full duty to the public it can not be held a sufficient ground for forfeiture. The company, having been invested with the powers, privileges, and franchises of a railroad corporation, is subject to all the duties and liabilities of such corporation, and there is ample power to compel the performance of any duty which it may neglect."

It appears that the principal or most important part of the business of this road will be the transfer of loaded and empty cars from one railroad to another, and from the various industrial enterprises to the several rail-

roads, and back again; but at the same time by its charter, it is obligated to do a general railroad business, both as to freights and passengers.

The fact that its principal and most important business is the transfer of loaded and empty cars from one point to another does not make it any the less a commercial railroad, under the provisions of the general law.

The fact that a railroad running through a coal section does most of its business in the hauling of coal does not make it any the less a commercial road, such as is contemplated by the general statutes.

The fact that passengers may rarely, if ever, pass over the line, does not deprive it of its character as a railroad.

The fact that it may run in a direction or through localities where passengers do not desire to go does not deprive it of its status as a railroad.

The fact that its main business is freight business, and a business in bulk, does not make it the less a public use.

As is said in *Ryan* v. *Terminal Co.*, 102 Tenn., 111, 50 S. W., 744, 45 L. R. A., 303, the term "public use" is a flexible one. It varies and expands with the growing needs of a more complex social order. Many improvements universally recognized as impressed with a public use were nonexistent a few years ago. This is equally true as to other appliances which now form important parts of a rapidly widening system of social and commercial communication. So it may be said at the present time that anything which will satisfy a reasonable

Collier v. Railroad.

public demand for public facilities for travel or for transportation or transmission of intelligence or commodities and of the general public, under reasonable regulations, and which have a definite and fixed use, independent of the will of the parties in whom the title is vested, would be a public use." Citing Mills on Eminent Domain, section 11; *Stewart* v. *Railway Co.*, (Minn.), 68 N. W., 208, 33 L. R. A., 427.

In this case the case of *Memphis Freight Company* v. *Memphis*, 4 Cold., 419, was commented upon and distinguished, in that the company in that case was organized for the purpose of building warehouses, and handling freight to and from those warehouses. The warehouses were the principal matter of use, and a short line of road, which was merely incidental to the business, was not a public use.

In the present case it is shown by the principal officers of the road that it is the purpose of the company to switch cars from one road to another, to receive freight on the line of its road, and give bills of lading over its own and other roads to any part of the world—in other words, to perform all the functions of an ordinary road.

We think, therefore, that it is clearly established, both by the charter and parol evidence, that the road is intended to subserve a public use, to confer a public benefit, to meet a public necessity; in short, to do any and everything that is required of an ordinary public commercial railroad.

It is said that the condemnation proceedings in this

case are void, because the railroad company is deviating from its charter right of way, inasmuch as it does not continue parallel with the Nashville, Chattanooga & St. Louis Railway near McLean avenue, and within 300 feet of that road, and, again, because it deviates from its line laid down in the charter after crossing Trezevant avenue.

The route between McLean avenue and the west line of Cooper avenue is as follows: "In a general easterly direction to the west line of Cooper avenue, the present eastern limits of the ctiy of Memphis thence in a general easterly direction across Trezevant avenue."

The place where the line is specified to run within 300 feet of the Nashville, Chattanooga & St. Louis Road is between Raleigh and McLean avenues; and at this point the Union Railway does run within 300 feet of the Nashville, Chattanooga & St. Louis Road, and it only begins to diverge just before getting to Cooper avenue; the Nashville, Chattanooga & St. Louis Road running in a northeasterly direction, and the Union Railway continuing in a general easterly direction, as the charter provides, until the locality of Buntin avenue is reached. In other words, the deviation is mainly beyond the city limits, but at and near the point where it crosses the lot of Collier and wife it approaches and crosses the Nashville, Chattanooga & St. Louis Road.

The president of the road gives a reason for this deviation, and shows that there were topographical reasons why the deviation should be made, among which was to

prevent the destruction of the Crescent Oilmill, and to make proper grade crossings at Cooper avenue, at Central avenue, at Trezevant, at Royster and Avery avenues.; and the location of the line as thus made would offer the least possible impediment to travel on the streets, and to the spread of the city in that direction. In addition, he says that the Nashville, Chattanooga & St. Louis Road is located upon practically a surface grade, and it would be impossible to follow that and construct a first-class road, and it was so constructed as to be both to the interest of the road, as well as for the benefit of the public.

In *Tenn. Cent. R. Co.* v. *Campbell,* 109 Tenn., 667, 73 S. W., 12, it was said: "Under the law, in regard to the construction of railroads, when the route is not definitely located by the charter, a legislative discretion is allowed in making such location, provided there is not a substantial deviation from the course and direction indicated by the charter," citing the authorities. In this case there was a deviation from a direct route of several miles.

These deviations are allowed according to the necessities of the road, the physical surroundings, and other cicumstances that enter into the consideration of railroad building; and the president of the road gives, we think, sound reasons of railroad construction and considerations of public convenience and public safety for the deviation as made, which, so far as we can see from the maps furnished us in the case, and from the general

description of the surroundings, is not a variation which materially affects Collier and wife.

It is further claimed that the Union Railway runs longitudinally on Buntin avenue, and that this is done without the consent of either the abutting owner or the county court, as is provided under the statute (Shannon's Code, section 1879).

The facts in regard to this feature do not appear very definitely. The decree and order of condemnation only condemns the Collier property up to the west line of Buntin avenue, and there is nothing in the record that shows that the route of the road will be upon Buntin avenue, unless it may be inferred from the map. It appears that, if the road touches Buntin avenue, it only reaches it a short distance from the end of the avenue, and then at a considerable angle, and does not run longitudinally along the avenue.

But we are unable to see how this is a matter of which Collier and wife can complain. If the railroad company is occupying the public highway improperly, it may be enjoined in a proper proceeding. But the point does not appear to be raised in the proof in the case, and is, we think, immaterial, so far as the rights of Collier and wife are concerned.

It is next said that the order confirming the report of commissioners divests the fee out of Collier and wife, and vests the fee in the railroad, instead of simply vesting it with an easement of right of way.

It appears, however, from a supplemental transcript,

that the decree complained of has already been corrected so as to give only an easement of right of way over the land in controversy.

It is said in the next place that the court erred in not leaving to the jury to determine the amount of land to be taken.

This assignment is not well made. The order appointing the jury directs that in estimating and assessing the damages the jury will give the cash value of the ground, and set apart by metes and bounds a sufficient quantity of land for the purposes intended, not exceeding the amount prayed for in the petition, and assess the damages occasioned to defendants thereby.

The jury, in its report, set aside one hundred feet, which was the amount asked for in the petition.

This answers the assignment made, if, indeed, the court might not itself have determined the amount to be taken, and merely left to the jury the assessment of damages.

It is said in the next place that the writ of possession was granted at a term subsequent to that when the report of the jury was confirmed.

It appears that the decree which was entered at the May term failed to award writs of possession, and it is insisted that it could not be issued at a subsequent term.

We think that this assignment is not well made, and that, so long as the court retains control of the subject-matter and the parties, writs of possession may issue.

We do no think that the power and jurisdiction of

the circuit court were gone, or that the court was deprived of its power to consummate its decree until it had made all orders necessary for a final adjudication of the case; and, if the court below had not the power to issue the writs of possession, then this court would either issue such writs, or remand the cause to the court below for that purpose, if we should be of opinion, as we are, that the railroad company has the right to make such condemnation.

Quite a number of other assignments are made, but we do not consider them material.

In connection with the case of *Collier and wife* v. *Union Railway Company,* we have heard the case of *State, ex rel. Wellford,* v. *Union Railway Company,* which is a proceeding to vacate and set aside the charter of the Union Railway Company, for various reasons, most of which have already been considered in the case of *Collier and wife* v. *The Railway Company.*

The only additional point which we think material to mention in the latter case is the fact that the railway company suspended its work and operations for a number of years, and thereby forfeited its charter rights.

We think this is not well made. The road did suspend for a number of years, but the project was never abandoned, and, so soon as funds were procured, the contemplated road was extended and built.

A railroad is not built in a day, and it is a matter of common information that, after being projected and partly constructed, they suspend operations and lie dor-

Collier v. Railroad.

mant for a number of years; but they do not lose their charter rights unless the lapse is so long as to amount to an abandonment.

The court is of the opinion that the Union Railway Company has the right to condemn the property of Collier and wife, and that they are not entitled to the relief which they ask.

It is therefore ordered that the petition of Collier and wife be dismissed, and that the cause be remanded to the court below for such further proceedings as may be necessary, and the judgment of the court below is affirmed, with costs.

The bill in the case of *State, ex rel. Wellford* is dismissed at the cost of complainant, and the decree of the court below is affirmed, with costs.

### DISSENTING OPINION.

MR. JUSTICE NEIL delivered the following dissenting opinion:

I dissent from the opinion of the majority in these cases, on the following grounds:

1. I do not think chapter 142, p. 232, Acts 1875, covers the kind of railroad which the Union Railway Company proposes to construct. It is claiming the right, under the form of charter for a railroad company provided by that act, to construct a railroad lying almost wholly within the city of Memphis, beginning at a point in the southwestern part of the city, running thence eastwardly, thence northwardly, thence westwardly, and thence southwestwardly to the beginning or starting point

making in its course an irregular loop around the city, and throwing out here and there laterals or branches, and from these branches other branches, so as to push its way into and through various and divergent parts of the city.

Acts 1875, p. 238, c. 142, section 6, provides for a railroad which shall run from one point at its beginning to another and distinct point, as its terminus—a line of railway, not a loop or belt. It contemplates a line which, if it begin at or within a given town or city, shall run to, and terminate at, some other town or city, or some point beyond such initial town or city, and not one which shall be confined to a single city. It looks alone to the creation of a line of railway which shall connect separated parts of the country, and which, for the purpose of connecting such distinct and separated portions of the State, and for serving the needs and convenience of intermediate portions of the country, shall have fixed and "regular times for the running of trains." It has in view a railway company which shall transport not only property, but passengers also, and which shall provide for the latter not only safe, but comfortable and convenient, accommodations, and shall receive and discharge them at fixed points along the line, and which for this purpose shall have regular stations, and, in respect of freight, a road which shall receive for transportation not only the property of individuals, but full-freighted cars from other roads and transport them, without breaking bulk, to the place of destination, and return

the cars to the road from which it received them; but it
is provided that it shall not be compelled to perform the
latter service unless the point of destination of cars is at
least twenty miles distant from the receiving point,
showing that the legislature had in view a line of rail-
way at least twenty miles long.

The statute provides that "the line or track of the road
shall be so constructed as not to interfere with the con-
venient travel of the public along the highways, county
roads, streets and alleys of cities, towns, and villages,
and so as to allow carts and wagons, carriages and other
vehicles, conveniently and safely to pass over or under
the line or track, and so as not to interrupt traveling
on foot or on horseback, or in vehicles of any kind, from
the necessary and proper use of the public road, street or
alley, in the usual and proper mode for their conven-
ience;" that boards, "well supported by posts, or other-
wise, shall be placed and constantly kept across each
public road when the same is crossed on the same level
by the track of the railway, the boards to be elevated
so as not to obstruct travel;" and that "on each side of
said board shall be printed in large letters, easily to be
seen by the traveler, the words, 'Railroad Crossing, look
out for the cars,' " but that "said boards need not be
put up at the crossing of streets and alleys in cities,
towns, and villages," but that "such railroad company
shall be subject to such proper regulations made by mu-
nicipal authorities in pursuance of general municipal
powers, regulating speed, passage, and flagmen, in such

municipalities." These provisions show that the legisla-
ture had in mind, not a line of railway which should
be confined to a single city, but one which should pass
through the country, and connect cities and towns with
each other.

The railroad before us in the present case fails to
come within the foregoing provisions in the following
particulars: It is confined to a single city. Its initial
point and its terminal point are the same; that is, it has
not an initial point and projection from that point to
a different point, as its ending or terminal. From its
very nature, as disclosed by its ground plan, it is design-
ed only for the transportation of freight, and cannot ac-
commodate passenger traffic. It has not the minimum
length (twenty miles) which the statute contemplates,
but, with all of its branches, only seventeen miles, and
is therefore not of such a description as that it can be
compelled to perform a very important part of the du-
ties of a railway company; that is, the reception of
loaded freight cars from other roads, their transporta-
tion and return.

As to the first point, that the road is confined to a
single city, I do not understand that the majority opin-
ion contains any reply, unless it be found in the fact that
in making the loop the line, in two places, runs beyond
the city limits, then, turning, comes back into the city,
but this is manifestly no answer to the point.

As to the second point, it is said that while it is true
that the line has not a "final" terminal, so to speak, dif-

Collier v. Railroad.

ferent from its initial point, yet there are intermediate termini; that is, in filling in the charter form, the draftsman indicated the turns or bends of the loop by specifying certain points through which the line was to pass in its progress from its initial point back to its initial point. I think it very clear that such intermediate points can in no sense be considered as termini. On the contrary, they are but points in the location of the line. The charter form set out in chapter 142, p. 232, Acts 1875, section 6, does not provide for the insertion of intermediate points, but only of the initial and the terminal point—the beginning and the end of the line.

As to the third point, that the road is not designed for the transportation of passengers, it is replied, in substance, that when it shall hereafter fail to comply with that provision of the charter, if it shall ever so fail, then such dereliction can be looked after, but that we should not now anticipate such breach of duty. I deem this an insufficient reply. It seems to me that any one can determine from merely looking at the ground plan of the road, spread out as it is over the city, and running across lots to reach factories and other heavy shippers of freight, that it was designed alone for freight service; that the thought of having stations for the reception and discharge of passengers, and fixed schedules for the running of trains, is wholly foreign to its purpose; that the accommodation of passengers, instead of being a use in harmony with the ends for which the road is to be constructed, would be a hindrance and obstacle in the way

of carrying out such purposes, and would be an assumption by it of duties performed far better by street car companies; that practically no passengers would ever wish to ride on such a road; and finally that the suggestion which the road now makes, that it expects to accommodate passenger traffic, is merely colorable.

As to the fourth point, that the road, not having twenty miles of length, will not be compelled to receive loaded freight cars from other roads, this seems to have received no consideration in the majority opinion, yet it seems to me a very important point. It is alleged in these causes, and seems to be fully proven, that the Union Railway Company is owned by the same people who own the Missouri Pacific Railroad. It will therefore be managed, naturally, as far as practicable, for the benefit of that corporation. The result will be that, whenever the interest of the Missouri Pacific Railroad Company requires that the interests of the other railway companies in the city shall be depressed, these interests will be depressed in so far as they can be, and the Union Railway Company will be used as an instrument to that end. By the use of the power of amendment which the majority opinion concedes to the Union Railway Company, that company will gradually push its laterals, and laterals from laterals, into all quarters of the city where any valuable freight is to be obtained, and, refusing to handle loaded cars for other roads at all, or only upon payment of an oppressive differential, will finally shut them out of the most of the important freight business of the

city. The only alternative left to the other roads will be the building of similar lines, and when these are proposed the city will be confronted with the alternative of suffering the Missouri Pacific to absorb substantially all of the traffic, and shut out all of the other roads, or of having its territory cut up in a similar manner by other roads, to the practical destruction of the city as a place to live in. Can it be doubted that the Union Railway Company will have the power to refuse loaded cars from other roads? It covers only seventeen miles, including all of its branches, and the charter says it shall not be compelled to receive loaded cars from other roads unless the point of destination is at least twenty miles from the receiving point. If offered such cars, and it refuse to receive them, and proceedings be brought to compel the performance of such service, it can stand upon its charter rights, and there will be then no power in the courts to compel. Thus the power to monopolize the character of traffic referred to is given, can there be any doubt that it will be used?

This result must follow unless the court shall hereafter hold that the charter does not mean what it says. The language of the charter upon this point is: "This corporation shall receive on their road full-freighted cars from other roads, and transport them, without breaking bulk, to the place of destination charging for the goods, wares, and merchandise therein, no greater rate of freight than is charged for similar goods, wares, and merchandise in their own cars, and return said cars

free of charge, provided the cars thus to be received are good and substantial, and also provided the distance said wares and merchandise are to be transported is not less than twenty miles."

The above-mentioned objectionable features, peculiar to the Union Railway Company's road, seem to me to indicate that it is a kind and description of railroad that was not intended to be authorized by the act of the legislature above referred to. Certainly no other road ever before chartered under that act is anywise comparable to it for peculiarity of plan and purpose, or possessed of such vast possibilities of power over the territory which it covers.

The majority opinion refers to a Kansas decision in support of its first position. I think that the decision referred to, based upon a statute very different from ours, can have little bearing, even as persuasive authority, in the construction of our own statute. Certain it is, it has no binding force.

2. I do not think there was any legislative authority for making the so-called amendments. By virtue of these amendments, sundry extensions, additions, branches, and branches of branches—seven in all—have been ingrafted on the original road, so that it is now more than twice as large as it was when its charter was obtained, in 1886. These extensions and branches thread the city, north, south, east, and west, and one branch penetrates its center.

The authority which the majority rely upon as justify-

Collier v. Railroad.

ing these amendments is chapter 116, p. 271, Acts 1897.

That statute, so far as it bears upon the present inquiry, reads as follows:

"The stockholders of any corporation, organized under a charter obtained under the provisions of the act entitled, 'An act to provide for the organization of corporations,' passed March 19, 1875, approved March 28, 1875, and being chapter 142, of the Acts of 1875, or organized under a charter obtained under an act amendatory to said act, or subsequent thereto, who may desire to change the name of such corporation, increase its capital stock, or obtain any power granted either by chapter 142 of the Acts of 1875, or by any act amendatory or subsequent thereto, shall have the right to do so under and in the manner provided by section 19 of said chapter 142, of the Acts of 1875, which provides for the amendment of charters granted by the legislature, and with the like effect as therein provided."

Section 19, page 257, of chapter 142, Acts of 1875, provides:

"That any corporation heretofore chartered by an act of the general assembly, which may desire to change its name, increase its capital stock, or obtain any powers granted by this act, shall have the right to do so, by the board of directors of said corporation copying said amendment, and making an application in these words: 'We the undersigned, composing the board of directors of (here insert the name of the corporation) apply to the State of Tennessee, by virtue of the general laws of

Collier v. Railroad.

the land, for an amendment to said charter of incorpo-
ration, for the purpose of investing said corporation
with the power (here state the clause in the general law,
aforesaid, which is desired as an amendment, or if it be
simply to change the name, so state the fact).    Witness
our hands, the ——— day of ———.'    (To be signed by
the directors.)    The same to be probated or acknowl-
edged as provided by section 15, of this act, and the cer-
tificate of registration  given by the secretary of state,
under the great seal of the State, shall complete the
amendment to said act of incorporation, and  the valid-
ity thereof shall not, in any legal proceeding, be collat-
erally questioned, as in cases of application for original
charter."[1]

Upon reading the act of 1897, reproduced above, it is
difficult to preceive wherein it provides for the making
of extensions, or the construction of laterals or
branches.

It is certain that no reference is made to these mat-
ters in the text of the act.    It is undeniable, therefore,

---

[1] Note by Mr. Justice Neil:
    The foregoing is an exact copy of section 19 of chap-
ter 142, Acts 1875.  In the majority opinion there is inserted in the
second bracket, in place of what appears in the original, the fol-
lowing language, viz.: ("of constructing, maintaining and operating
a railroad along and over the following routes, which are in addi-
tion to the route already granted to it, by its charter").    These
words do not appear in the original, but were substituted in the ma-
jority opinion in place of the words appearing in the original, as,
no doubt, a construction of these words as applying to the kind of
case we have before us.  But with all due respect to my learned
brothers, I am constrained to say that, in my judgment, there is no
"clause in the general law" on which that substitution can rest,
and the majority opinion does not undertake to point out such
clause.

Collier v. Railroad.

that the power to make such "amendment" cannot be directly deduced from the act itself.

As I understand the position of the majority, it is that the power is to be found in chapter 142, page 232, Acts 1875, referred to in the act of 1897. As shown by section 19 of the act of 1875, above copied, that act does provide for the making of amendments by corporations chartered by special acts of the legislature, and the act of 1897 extends the same power to corporations chartered under the act of 1875, page 232, chapter 142, and under acts subsequent thereto. The power of amendment given in the act of 1897 is "to change the name of such corporation, increase its capital stock, or obtain any power granted either by chapter 142 of the Acts of 1875, or by any act amendatory or subsequent thereto." A perusal of chapter 142, page 232, Acts 1875, for the purpose of discovering therein a power to make such "amendments" as extending the line of a railway beyond the terminus originally fixed in its charter, or the building of laterals, or laterals branching out from laterals, will be in vain. No such power can be found there. The subject is not mentioned in that act. It is conceded by the majority that there is no subsequent valid act that would justify such amendments as those above referred to, and I need not go into that matter. The necessary conclusion from what has been stated is that the amendments were made without authority of law.

3. The conclusion of the majority of the court has

been reached by a most latitudinarian and expansive construction of chapter 116, page 271, Acts 1897, and chapter 142, page 232, Acts 1875—so much so that I may well apply to the process a reference which Lord Macaulay makes in one of his essays to the tent which the fairy Paribanou gave to Prince Ahmed: "Fold it, and it seems a toy for the hand of a lady, spread it, and the armies of powerful sultans might repose beneath its shade."

The rule often heretofore announced in this State is that charters, grants of power by the State to corporations, must be strictly construed. The rule on this subject is that nothing should be taken or conceded, as against the State or public, in favor of the corporation, that is not given in unmistakable terms, or by an implication as clear. *Turnpike Co.* v. *Davidson County,* 106 Tenn., 258, 61 S. W., 68; *Gas Co.* v. *Williamson,* 9 Heisk., 326; *State* v. *Turnpike Co.,* 2 Sneed, 89. Numerous other cases might be cited from our reports to the same purport. It is true that several of the points stated in this opinion are technical in their nature, and are based upon a very strict construction of the acts referred to; but it is just this character of construction that all our prior cases and the law and sound public policy require, when the court is called upon to construe legislative grants that in their nature purport to convey privileges and powers that carry somewhat of the sovereign authority of the State itself. This fundamental

Collier v. Railroad.

rule has, as I conceive, been wholly disregarded in the present case.

In conclusion, I may add that I am not disposed to controvert the proposition that roads of the character of the Union Railway, when properly restricted, may be very useful, and, in a sense, necessary to the full devel-- opment of the cities of the State; but they should ob- tain their charters under clear, unambiguous, and un- mistakable legislative acts, not from the courts by dubious and uncertain construction of existing laws that on their face seem designed for other purposes. Such a course of construction may be productive of a present good to one or more communities of the State, but, if persisted in, cannot fail to be hurtful to the whole State. It is safest and best to stand by the old landmarks of the law, and especially that one which requires that grants of charter powers shall be strictly construed.